# United States Court of Appeals
## For the First Circuit

Nos. 06-1399, 06-2345

MINYA K. ZERU and RUSSOM B. GHEBRAI,

Petitioners,

v.

ALBERTO F. GONZALES,
Attorney General of the United States,

Respondent.

PETITIONS FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Boudin, Chief Judge,
Torruella and Lynch, Circuit Judges.

Howard A. Silverman and Ross, Silverman & Levy LLP on brief for petitioners.

Jeanette Kain, Harvey Kaplan, and Kaplan, O'Sullivan & Friedman on brief, for Advocates for Survivors of Torture and Trauma et al., amici curiae.

Eric W. Marsteller, Attorney, Peter D. Keisler, Assistant Attorney General, and M. Jocelyn Lopez Wright, Assistant Director, U.S. Department of Justice, on brief for respondent.

September 19, 2007

**LYNCH**, **Circuit Judge**.  Petitioners Minya Zeru and her husband, Russom Ghebrai, both natives and citizens of Eritrea, applied for asylum on the basis of past persecution and a fear of future persecution.  The petitioners premised their application on government harassment of Zeru due to her membership in an organization that advocated Eritrean independence when that country belonged to Ethiopia; the organization now opposes the incumbent Eritrean government.  Following hearings conducted over the course of almost five years, an Immigration Judge (IJ) found petitioners' testimony to be not credible, that they had not established past persecution, and that, in any event, there was no basis for a claim of future persecution.  The IJ thus denied the asylum application.  The Board of Immigration Appeals (BIA) affirmed in a per curiam order.

Zeru and Ghebrai moved to reopen by challenging the credibility determination and alleging ineffective assistance of counsel during the asylum appeal to the BIA.  The BIA denied the motion.

Zeru and Ghebrai petition for review of both the denial of asylum and the denial of the motion to reopen.  The petition is supported by an amicus brief on behalf of various groups concerned with the rights of refugees and torture victims.  We affirm both of the BIA orders and deny the petitions for review.

I.

A.        Denial of Claims for Relief

Zeru arrived in the United States on December 20, 1994. Her non-immigrant business visa allowed her to remain in the United States until July 20, 1995. In October 1995, she filed for asylum and for withholding of removal and was interviewed by an asylum officer. Zeru's case was transferred to the Immigration Court. In February 1998, both Zeru and Ghebrai, who had overstayed his visa as well, received Notices to Appear charging them with removability. Zeru and Ghebrai conceded removability, but both sought asylum, withholding of removal, voluntary departure, and relief under the Convention Against Torture (CAT) based on Zeru's assertions of political persecution.

An IJ heard testimony from Zeru and Ghebrai on five occasions between January 20, 1999, and March 21, 2002.[1] In those initial hearings before the original IJ, Zeru testified to the following facts. She was born in 1968 in Massawa, then a part of Ethiopia. From the age of fifteen, Zeru began pamphleteering and engaging in fundraising activities on behalf of the Eritrean Liberation Front-Revolutionary Council (ELF-RC), a political group devoted to Eritrean independence and the establishment of a multi-

_____

[1]    The IJ continued the first hearing, in which he heard testimony from Zeru, due to concerns about the quality of the interpreter. Zeru began her testimony anew, with a different interpreter, at the next hearing on August 27, 1999.

-3-

party democratic system of government. Zeru kept her political activities secret from her family, fearing retribution from various political opponents. One rival separatist group in particular, the Eritrean Peoples' Liberation Front (EPLF), opposed the ELF-RC's agenda in favor of single-party rule.

Zeru testified that she was arrested in 1987 by Ethiopian soldiers acting on a tip from the EPLF, and endured a six-month period of imprisonment ending on January 27, 1988. She testified that she was raped, and that she was beaten numerous times by her jailors. Following her release, Zeru spent six months in outpatient treatment for depression in Ethiopia.

Within a year of her release from imprisonment, Zeru resumed fundraising for the ELF-RC. By that time, she had met Ghebrai, a physician who worked in a state-run hospital. Zeru testified that she did not tell Ghebrai about her political activities or her prior imprisonment. Zeru and Ghebrai testified that they were married in January 1990.

The EPLF defeated the Ethiopian military in 1991 and took power in Eritrea. Zeru testified that Eritrean security forces (according to Zeru, effectively the same organization as the former EPLF) began harassing her in 1993, following a failed coup attempt. On two occasions, security officers detained Zeru and interrogated her in security forces offices near her import business in Asmara. Then, in September 1994, Eritrean officers detained Zeru for a ten-

-4-

hour interrogation. According to testimony that Zeru gave in August 1999, one of her interrogators held a gun to her head and threatened to kill her. Zeru testified that she had "never felt worse" than during that encounter.

After the September 1994 incident, Zeru sought the advice of a friend who worked as a secretary with the Eritrean security forces. In November, the friend warned her that her name had appeared on a list of ELF-RC members, and that she was in grave danger. Leaving the country, her friend said, was her "only option." At that point, Zeru told Ghebrai about her political activities and her history of harassment by government officials. Zeru testified that she obtained a visa and passport through her secretary friend and left Eritrea. This was more than six years after her 1987-88 imprisonment. Zeru arrived in Boston in December 1994 and resided with a cousin in Portland, Maine. She was eight months pregnant with her second child at the time.

Zeru testified that she did not contact her family after leaving Eritrea, and that she had not been in communication with them until recently. Nor did Zeru have any contact with Ghebrai, but communicated with him in occasional messages conveyed through a relative. Ghebrai entered the United States in March of 1996, on a short-term visa to study medicine in Los Angeles, but initially had no contact with Zeru. Ghebrai did not join Zeru in Maine until completing six months of medical training.

A new IJ was assigned to petitioners' case in 2003. He reviewed the record, including petitioners' previous testimony, and held a full day of hearings on November 26, 2003. Zeru and Ghebrai reiterated their prior testimony. Zeru stated during direct evidence that she had been raped once, at the start of her imprisonment in 1987. Later, following cross examination and in response to questioning by the IJ, Zeru said there were two instances of rape, the second just before her release.

Petitioners also presented an affidavit and testimony from a fact witness named Efrem Weldemichael. Weldemichael, a native of Eritrea and a United States citizen, testified that he was an ELF-RC executive committee member in the United States. Weldemichael testified that he knew Zeru as an ELF-RC member when they were both in Ethiopia during the mid-1980s; he also testified that he heard reports from other ELF-RC members in 1987 or 1988 that Zeru was imprisoned by the Ethiopian government.

The IJ also heard from Dr. Melissa Wattenberg, a clinical psychologist specializing in Post-Traumatic Stress Disorder (PTSD), whom petitioners presented as an expert witness. Wattenberg was not a treating psychologist and did not provide therapeutic services to Zeru. Rather, at the request of Zeru's counsel, she interviewed Zeru about her experiences during two meetings in October and November of 1998, almost four years after Zeru entered the country, and produced a detailed Assessment Report dated

December 1999.  That report summarized Zeru's oral statement of her own history and concluded that "Ms. Zeru meets criterion for current moderate PTSD, and moderate depression."  The report also opined that Zeru "is a sincere and reliable reporter of her own experience."  Zeru told Wattenberg that she had been raped three times, which differed from her hearing testimony.

Zeru's attorney sought to use Wattenberg's testimony to establish the contents of her report and to assess Zeru's credibility.  The IJ admitted the report into evidence and indicated that he need not hear testimony duplicative of the report's contents.  Zeru's counsel stated that she had no other questions for Wattenberg, and rested on the contents of the report.

The IJ also reviewed petitioners' documentary evidence during the November 26, 2003, hearing.  The hearing opened with the IJ pointing out that Ghebrai failed to bring his original passport, including the relevant visa page, to the hearing.  Petitioners presented the IJ with a letter they had written to the hospital in Eritrea where Zeru had allegedly received treatment following her 1987-88 incarceration, but they were unable to produce the hospital records requested in the letter.  Zeru also produced an ELF-RC identification card issued at Zeru's request from the organization's office in Bonn, Germany, in 1998.  Zeru testified that she did not carry such a card in Eritrea, but that she

obtained it because she "was asked to produce this to prove my membership."

Zeru also entered into evidence an official letter signifying her release from the prison where she was held in Ethiopia. Zeru testified that she possessed the letter since 1995. Zeru's attorney explained that the document could not be verified by the United States Embassy in Addis Ababa because petitioners had sent a copy instead of the original document to the embassy.

Finally, petitioners submitted their marriage certificate. They sent the certificate for verification to the United States Embassy in Asmara, but the embassy responded that Zeru's date of birth as listed on the certificate conflicted with the date recorded in Asmara municipal records. In addition, certain information on the certificate, including the bride's date of birth and the date of the marriage contract, had been covered with white-out and typed over. The IJ admitted all of the documents into evidence, noting that he would "give them what weight I deem is appropriate."

On December 29, 2003, the IJ denied the asylum application and ordered petitioners' removal. The IJ based his decision on adverse credibility findings for Zeru and Ghebrai, a lack of corroborating evidence requested by IJs during the proceedings, and the submission of apparently fraudulent documents. We describe some, but not all, of the IJ's findings. The IJ gave

a number of reasons for his credibility determinations. Among them, he pointed out that Zeru claimed on different occasions to have been raped once, twice, or three times. The IJ noted that even if he was willing to ignore the contradiction in Zeru's testimony between whether she was raped once or twice during her six-month detention, he was still concerned that Zeru had told Wattenberg that she was raped three times. It was the inconsistency between her testimony to the IJ and her report to Wattenberg that the IJ found material and relevant. The IJ stated that "it would not be unusual for a victim of trauma to confuse dates or sequences of events, but it would be very unusual . . . to simply forget that an event occurred." The IJ recited numerous other inconsistencies in petitioners' testimony relating to their backgrounds, their marriage, their experiences in Eritrea, and their work histories.

The IJ noted that Zeru had been asked to produce specific documents to corroborate her claim and failed to do so. For example, the IJ noted that she had testified that her uncle was arrested in 1993 for involvement in a coup attempt and that the arrest was very well publicized. She was directed at a hearing on August 27, 1999, to obtain news reports or other information to substantiate the arrest. Yet at the hearing on November 26, 2003, she neither produced the documents nor had an explanation for her failure to do so.

In addition, the documents petitioners did submit contained inconsistencies and evident alterations detracting from petitioners' claims. The IJ recounted the bases for his findings that the prison release letter,[2] the marriage certificate[3] and other documentary evidence offered by petitioners were fraudulent.

The IJ further observed that petitioners' demeanor during the November 26, 2003, hearing belied their believability. The IJ not only found Ghebrai to be wholly incredible, but also that he had given fraudulent testimony under oath. Indeed, the IJ found that he doubted the testimony of both petitioners even as to their identities and whether they were husband and wife.

The IJ also made an adverse credibility finding as to Weldemichael. The IJ pointed out that in his affidavit, Weldemichael stated that he first met Zeru in Ethiopia in 1983 and saw her "a couple of time[s]" in that context. At the hearing, however, Weldemichael insisted that he first met Zeru in 1986, and only met her once in Ethiopia. The IJ also found it incredible

---

[2]   For example, the IJ found it telling that though Zeru said she had the letter in her possession since as early as 1995, she did not present it to the asylum officer at her interview. He found the document most likely had been recently fabricated to support her testimony.

[3]   The IJ suspected that the certificate was fraudulent because of the unexplained presence of white-out on the document, the discrepancy regarding Zeru's purported date of birth between the certificate and Asmara municipal records, and the fact that the United States Embassy could not determine whether the certificate was genuine. The IJ also pointed out that petitioners could provide no other documentary evidence of their marriage.

that although Weldemichael purported to be an ELF-RC leader in Ethiopia, and although he had heard reports of Zeru's imprisonment due to her ELF-RC affiliation, Weldemichael never took enough interest in Zeru's plight to investigate Zeru's condition in prison or whether she was released before the two met again in the United States in 1994. The IJ also observed Weldemichael's demeanor and stated that he "simply cannot find that Mr. W[e]ldemichael was credible."

Because petitioners' testimony was not credible, and because their corroborating evidence was not only insufficient to support their claims, but in fact contradicted them, the IJ found that Zeru and Ghebrai had failed to establish either past persecution or a well-founded fear of persecution following their return to Eritrea. See 8 C.F.R. § 1208.13(a)-(b) (asylum applicants bear burden of proof to establish refugee status); see also Singh v. Gonzales, 413 F.3d 156, 159 (1st Cir. 2005) (citing Diab v. Ashcroft, 397 F.3d 35, 39 (1st Cir. 2005)) (stating that corroborating evidence may bolster the testimony of a less than entirely credible alien). In concluding that petitioners had not established past persecution, the IJ found that petitioners had shown neither that they suffered any harm nor that they had established a nexus to one of the five statutory grounds for establishing refugee status. 8 U.S.C. § 1158(b)(1)(B)(i); 8 C.F.R. § 1208.13(b)(1). The IJ also separately rejected the claims that

petitioners would suffer persecution on their return or had a well-founded fear of future persecution.  See 8 C.F.R. § 1208.13(b)(2).  The IJ noted that petitioners' close relatives continued to live peacefully in Eritrea.  Indeed, Zeru's brother was in the military, and her family continued to live in the same home and run the family business, unmolested by the Eritrean government.  The IJ also denied petitioners' applications for withholding of removal, protection under the CAT, and voluntary departure.[4]

Zeru and Ghebrai retained a new attorney, Solomon Bekele, for their appeal to the BIA.  On appeal, petitioners insisted they had established past persecution.  They claimed that the IJ erred in his credibility finding because he improperly demanded authenticated documentary evidence to prove petitioners' claims.  They also objected to the IJ's use of demeanor in finding Zeru and Ghebrai incredible.

Petitioners described inconsistencies regarding the number of Zeru's rapes as "minor" and explained them as lapses in memory due to the passage of time.  Petitioners also claimed that the second IJ did not observe proper procedures applicable upon assigning a new judge to an immigration case.  Petitioners additionally argued that because Zeru had established past

_____

[4]    Petitioners' brief does not advance any arguments regarding their claims for withholding of removal, protection under the CAT, or voluntary departure.  Those claims accordingly have been waived for purposes of this petition.  See Dine v. Gonzales, 464 F.3d 89, 93 (1st Cir. 2006).

-12-

persecution, petitioners were entitled to a finding of well-founded fear of future persecution and a grant of their withholding of removal claim. Finally, petitioners made a perfunctory argument that they qualified for protection under the CAT.

On February 7, 2006, the BIA affirmed, incorporating an earlier August 3, 2005 per curiam order. The BIA upheld both the lack of credibility finding and the finding that the inconsistencies were not sufficiently explained. The BIA noted that it did not find persuasive Zeru's argument that the inconsistencies were caused by lapses of memory. Further, that argument did not explain inconsistencies in Ghebrai's and Weldemichael's testimony. The BIA also noted that the IJ allowably considered the demeanor of the witnesses.

The BIA also found a lack of corroborating evidence. The BIA noted that Zeru's immediate family members continued to reside in Eritrea without harm. As to the argument that this was explained by the fact that her family members were politically inactive, the BIA noted that was inconsistent with her husband's testimony that he was not politically active, but nonetheless he had been threatened repeatedly by security agents. In turn, it was implausible that the husband, had he been threatened by government agents, would have been granted a passport and permitted to travel to the United States.

The BIA also addressed petitioners' argument regarding the assignment of a new IJ to their case.  The BIA's decision made clear that the IJ complied with the requirement that he familiarize himself with the record and so state on the record.  In fact, the IJ's opinion made repeated reference to details of petitioners' testimony given in hearings presided over by the previous IJ.

B.        <u>Motion to Reopen</u>

Zeru and Ghebrai, represented by new counsel, filed a motion to reopen on May 5, 2006.  The motion was based on alleged new information about Zeru's PTSD and on alleged ineffective assistance of counsel stemming from Bekele's representation during the initial appeal.

Zeru and Ghebrai offered evidence tending to show that Zeru's PTSD had worsened.  Zeru's evidence was that she suffered a breakdown upon learning of her imminent deportation to Eritrea and was hospitalized on November 12, 2005, for depression and suicidal thoughts.  Zeru submitted a letter from Dr. John Mirczak, a psychiatrist who treated her after her release from the hospital, dated February 1, 2006, and stating that Zeru suffered severe PTSD as a result of  "multiple gang rapes . . . suffered while a political prisoner in Eritrea."  The letter further stated that Zeru's symptoms would worsen if she were to return to Eritrea. Petitioners also submitted a "supplementary psychological assessment" from Dr. Mirczak dated April 27, 2006.  Dr. Mirczak

-14-

wrote that "what can sometimes happen with trauma patients is that they may dissociate" and that their memories "may be repressed." The supplemental assessment does not explicitly ascribe such symptoms to Zeru.

The motion also relied on three other letters to petitioners' attorneys from mental health professionals regarding Zeru's PTSD diagnosis. The first, from a staff member at the Psychiatric Institute of Washington named Dianne Carlson, explained that Zeru had flashbacks to her imprisonment and rapes, and that Zeru used dissociation and denial to avoid re-experiencing past traumas. The second letter contained the impressions of a psychologist, Jane McGoldrick, who met with Zeru twice in April 2006. McGoldrick wrote that Zeru referred in her meetings to her rape and torture, but that she was "too tearful and distressed to report details" of those episodes. McGoldrick asserted that Zeru's recovery was contingent upon the success of her asylum claim.

Finally, the motion to reopen presented a lengthy letter from F. Barton Evans, a forensic psychologist retained by petitioners' counsel to review the Wattenberg report and provide a "literature review" regarding PTSD. The letter aimed at contradicting the IJ's statement that "it would not be unusual for a victim of trauma to confuse dates or sequences of events, but it would be very unusual for a victim of trauma to simply forget that an event occurred." The IJ was referring to the difference between

Zeru's testimony and what she told Wattenberg about the number of different occasions on which she had been raped. Evans wrote that Wattenberg's affidavit negated the IJ's statement because of its reference to Zeru "recall[ing] feeling dissociated from her body during these rapes" and "utiliz[ing] avoidant strategies." Evans cited several psychological studies for the proposition that PTSD victims may suffer inconsistent recall of traumatic events. Evans wrote that "from the perspective of the psychology of trauma, the presence of dissociative symptoms in fact adds believability to [Zeru's] report." Petitioners' motion to reopen explained that all of the foregoing letters "challenged the credibility finding stemming from Zeru's differing statements regarding the number of times she was raped."

Zeru and Ghebrai claimed ineffective assistance of counsel because "Bekele's work was egregiously deficient in preparation of" the asylum appeal. This was so because Bekele failed to address adequately in his brief the IJ's adverse credibility findings in general, and in particular "the most important ground of appeal, namely the virtual elimination of the testimony of [Wattenberg,] who was in the best position to address . . . Zeru's credibility." Petitioners argued that Bekele's failures amounted to a due process violation. The motion to reopen did not address the IJ's decisions regarding withholding of removal, the CAT, or voluntary departure.

The BIA denied the motion to reopen on August 22, 2006, in a four-page, closely reasoned order discussing, inter alia, the specifics of the new medical evidence. The BIA noted the limited nature of the new evidence. Mirczak's letter opined that Zeru's memory "could have been [a]ffected by dissociation, but overall she is being factual about the brutality that happened." McGoldrick, who said the disorder Zeru was suffering "often has as symptoms" memory problems and amnesia for aspects of traumatic experiences, did not say that Zeru suffered those symptoms. The BIA stressed that Evans did not even conduct a direct examination of Zeru.

The BIA met head-on Evans's criticism of the IJ's statement that "it would not be unusual for a victim of trauma to confuse dates of sequences of events, but it would be very unusual for a victim of trauma to simply forget that an event occurred." Even accepting Evans's criticism, the BIA held that it would not likely have changed the outcome of the proceeding, for several reasons. Zeru's inconsistent statements about the number of occasions on which she was raped were not the sole basis for the lack of credibility finding, which rested on numerous independent inconsistencies as well as upon the IJ's assessment of Zeru's demeanor. Also, Zeru had failed to provide corroborating evidence. The entire body of medical evidence rested on the credibility of her reports to the doctor, but the IJ had, based on substantial evidence, found her not to be credible in her reporting of her

-17-

history.  Further, the basic PTSD diagnosis evidence was before the BIA in the prior appeal and had been considered.

As to the ineffective assistance claim, the BIA reasoned that it also failed because even considering the new evidence and new emphasis on the effects of trauma on memory (the argument prior counsel, it was argued, should have made), the respondent still had not demonstrated that the outcome might have differed.

Zeru and Ghebrai timely petitioned to this court for review of the BIA's rejection of their asylum appeal and the Board's denial of the motion to reopen.

## II.

Petitioners urge this court that "the Petition for Review of the Motion [to Reopen] should . . . be held to be the functional equivalent of the direct appeal" such that the two petitions would be reviewed under the same standard and with reference to the entire administrative record.  Based on this misunderstanding, petitioners conflate their arguments challenging the denial of asylum and the denial of the motion to reopen.

The two petitions are legally distinct.  See Keo Chan v. Gonzales, 413 F.3d 161, 165 n.3 (1st Cir. 2005) ("[T]he legal separateness of the denial of the asylum claim and the motion to reopen is demonstrated by the fact that each is a separate appealable order."); see also 8 U.S.C. § 1252(b)(4)(A) ("[T]he court of appeals shall decide the petition only on the

-18-

administrative record <u>on which the order of removal is based</u>.")
(emphasis added).  We review them separately according to their
respective records and standards of review.  <u>See, e.g.</u>, <u>Zeng</u> v.
<u>Gonzales</u>, 436 F.3d 26, 29, 32 (1st Cir. 2006); <u>Olujoke</u> v. <u>Gonzales</u>,
411 F.3d 16, 21, 23 (1st Cir. 2005); <u>Fesseha</u> v. <u>Ashcroft</u>, 333 F.3d
13, 18, 20 (1st Cir. 2003).

A.       <u>Denial of Asylum</u>

Petitioners challenge the denial of asylum by attacking
the IJ's credibility findings.  Petitioners assert that the IJ did
not give sufficient weight to evidence provided by Wattenberg, who
"would have been able to address the impact of PTSD on Ms. Zeru's
memory and ability to recollect certain events related to her
trauma."  This is dispositive, petitioners argue, because they
characterize the IJ's credibility finding as turning on Zeru's
inconsistent testimony as to the number of times she was raped
after her imprisonment in 1987.  Petitioners also argue that the
credibility finding, to the extent it was based on other
inconsistent testimony or deficiencies in corroborating evidence,
was based on trivial or immaterial evidence.  We hold that
substantial evidence supports the IJ's findings and deny the
petition for review.

We must affirm an IJ's findings of fact, including the
credibility of witnesses, if they are "supported by reasonable,
substantial, and probative evidence on the record considered as a

whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (quoting 8 U.S.C. § 1105a(a)(4)) (internal quotation marks omitted). An IJ's credibility determinations demand deference where (1) the discrepancies and omissions described by the IJ are actually present in the record; (2) those discrepancies and omissions provide specific and cogent reasons to conclude that the petitioners provided incredible testimony regarding facts central to the merits of the asylum claim; and (3) petitioners do not provide a convincing explanation for the discrepancies and omissions. Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006) (citing Hoxha v. Gonzales, 446 F.3d 210, 214 (1st Cir. 2006)).

The IJ based his findings of incredibility on, inter alia, numerous inconsistencies in Zeru's testimony. First, although Zeru told Wattenberg that she had been gang raped three times during her imprisonment from 1987-88, she testified to the IJ that she had been raped once, and then later, that she had been raped twice. Second, Zeru testified in August 1999 that in September 1994, Eritrean security officers interrogated her for ten hours, at one point pointing a gun at her and threatening to kill her. She testified that the encounter terrified her. In November 2003, however, Zeru described the episode as a four-hour questioning, and stated that she did not take the officers' warnings seriously. Third, Zeru told Wattenberg that she met Ghebrai when working at a pharmacy owned by her father. In

contrast, Zeru testified to the IJ that they met at the government hospital where Ghebrai worked and where Zeru did volunteer work. Fourth, Zeru testified in 2000 that she completed twelfth grade, while in 2003 she testified that she attended school until the tenth grade. Fifth, Zeru gave inconsistent testimony as to how long she owned her own business in Asmara and what products her store sold.

As to Ghebrai's testimony, the IJ noted inconsistencies as to when he learned of Zeru's participation in the ELF-RC, as well as conflicting testimony regarding the location of Ghebrai's alleged encounters with Eritrean security forces searching for Zeru after her departure to the United States. The IJ also stressed that Ghebrai's demeanor during his November 2003 testimony "was one of a person who completely lacked v[e]racity."

Morever, the IJ cited discrepancies and omissions in the petitioners' corroborating documentary evidence that bolstered his determination of incredibility. The document that Zeru offered as proof of her 1987-88 imprisonment could not be authenticated when she sent a copy to the United States Embassy in Ethiopia. There were reasons to doubt another important document. Petitioners' marriage certificate revealed an inconsistency with Asmara municipal records regarding Zeru's date of birth, and the whited-out document displayed signs of tampering. The documentary problems continued: Zeru testified that hospital records were

available in Eritrea to corroborate her outpatient treatment for depression in 1988. In spite of being advised by an IJ to obtain those documents, and in spite of the fact that her family lives in proximity to the hospital in Eritrea, Zeru was able neither to produce the hospital records nor to explain why she did not produce them. Nor was Zeru able to produce business records or the mandatory annual government permits for the business in Asmara that she testified at various times to having operated for either one year or for three and a half years. Petitioners were not even able to produce, at an IJ's request, income tax filings, employment-related documents, or any other documents that could corroborate that they were indeed married.

Petitioners concede, appropriately, that these discrepancies are "specific and cogent" to a finding of incredibility, and that some of them "do go to the heart of the asylum claim." Petitioners seem to suggest, however, that had the IJ given due weight to Wattenberg's testimony, her diagnosis of PTSD would have adequately explained the discrepancies in Zeru's testimony regarding traumatic events, especially variations in the number of alleged rapes.

During their direct appeal to the BIA, petitioners did not challenge the credibility determination on grounds that the inconsistencies resulted from PTSD. Instead, petitioners attempted at that stage to explain away testimonial inconsistencies as "the

-22-

result of memory laps[e]" due to the passage of time between events in Eritrea and the asylum hearings.  Issues not raised before the BIA generally may not be raised for the first time on a petition for review.  Bernal-Vallejo v. INS, 195 F.3d 56, 64 (1st Cir. 1999).

Even construing petitioners' arguments in front of the BIA as encompassing the PTSD theory, however, we cannot conclude that "any reasonable adjudicator" would be compelled to disagree with the IJ's credibility determination.  8 U.S.C. § 1252(b)(4)(B). Wattenberg's Assessment Report was based on Zeru's oral representations to Wattenberg, which the IJ concluded were untrustworthy.

Even so, the IJ did not ignore the report or Wattenberg's diagnosis of Zeru as suffering from PTSD.  The IJ expressly acknowledged that "it would not be unusual for a victim of trauma to confuse dates or sequences of events."  The IJ expressed his doubt that such an effect would be sufficient to explain Zeru's disparate statement to Wattenberg and her testimony as to the number of times she was raped.  No evidence was ever submitted by petitioners to contradict that specific doubt.  Indeed, no specific evidence was submitted to the BIA on this point until the motion to reopen, when Evans addressed it in his letter, and he had not even met Zeru.

Further, even assuming arguendo the accuracy of Wattenberg's diagnosis of PTSD, petitioners do not claim that PTSD clouded Zeru's testimony regarding non-traumatic facts of life such as dates of birth, educational level, where she met her future spouse, or how long she owned her own business. Nor does Wattenberg's report offer any explanation of the many gaps and contradictions within petitioners' documentary evidence. Taken as a whole, the record available to the BIA at the time of petitioners' direct appeal provides substantial evidence in support of the IJ's credibility determination.

B.        Denial of Motion to Reopen

Petitioners challenge the BIA's denial of the motion to reopen on two grounds. They first assert a due process violation resulting from an alleged ineffective assistance of counsel during the appeal of the asylum proceedings to the BIA. They also argue that the BIA erred in discounting the newly presented evidence of Zeru's PTSD in denying the motion to reopen.

Motions to reopen deportation proceedings are disfavored due to the "strong public interest in bringing litigation to a close . . . promptly." Fesseha, 333 F.3d at 20 (quoting INS v. Abudu, 485 U.S. 94, 107 (1988)) (internal quotation marks omitted). The normal deference granted agency decisions on motions to reopen applies with greater force in the immigration context because of the implications for foreign relations. Ven v. Ashcroft, 386 F.3d

-24-

357, 360 (1st Cir. 2004) (citing Abudu, 485 U.S. at 110). We review the BIA's denial of a motion to reopen for abuse of discretion, reversing the denial "only if the BIA 'misread the law' or acted 'in an arbitrary or capricious fashion.'" Fesseha, 333 F.3d at 20 (quoting Carter v. INS, 90 F.3d 14, 17 (1st Cir. 1996)).

A motion to reopen proceedings before the BIA must state "new facts that will be proven at a hearing to be held if the motion is granted." 8 C.F.R. § 1003.2(c)(1). The evidence sought to be offered must be material and neither available nor discoverable at the former hearing. Id. Ineffective assistance of counsel claims, in certain circumstances, may satisfy these general requirements. Saakian v. INS, 252 F.3d 21, 25 (1st Cir. 2001).

While aliens in deportation proceedings do not enjoy a Sixth Amendment right to counsel, they have due process rights in deportation proceedings. Id. at 24. As an "integral part" of this procedural due process, aliens in deportation proceedings have a statutory right to be represented by counsel at their own expense. Id. (quoting Batanic v. INS, 12 F.3d 662, 667 (7th Cir. 1993)); see also 8 U.S.C. § 1362. "Ineffective assistance of counsel in a deportation proceeding is a denial of due process only if the proceeding was so fundamentally unfair that the alien was prevented from reasonably presenting his case." Lozada v. INS, 857 F.2d 10, 13 (1st Cir. 1988) (quoting Ramirez-Durazo v. INS, 794 F.2d 491, 499-500 (9th Cir. 1996)) (internal quotation marks omitted). To

-25-

succeed on an ineffective assistance of counsel claim, petitioners must show "a reasonable probability of prejudice" resulting from their former representation. Saakian, 252 F.3d at 25.

The gravamen of petitioners' argument before the BIA and this court is that their appeal of the denial of asylum was prejudiced by Bekele's failure to challenge adequately the IJ's credibility determination. Petitioners peg their arguments to counsel's failure to argue that Wattenberg's PTSD diagnosis explained the inconsistencies and undercut the lack of credibility finding.

Neither the IJ nor the BIA rested either solely or necessarily on Zeru's inconsistent testimony concerning traumatic past events in denying petitioners asylum. The BIA noted in its denial of the motion to reopen that it had reviewed Wattenberg's report and testimony. The Board, informed by that information, concluded that although petitioners had challenged some of the IJ's bases for his credibility determination, the board "[did] not find that [petitioners] have demonstrated that all bases . . . were erroneous." Therefore, even if Bekele's initial appeal were deficient in some respects, petitioners have failed to demonstrate that the result would have been any different given their present arguments. In addition, "the Board's careful attention to [petitioners'] motion to reopen . . . negated any possible

violation" of petitioners' Fifth Amendment rights.  Lozada, 857 F.2d at 14.

Petitioners raise another due process issue related to Wattenberg's testimony.  Petitioners argue the IJ improperly limited Wattenberg's testimony and thereby "deprived Ms. Zeru of the opportunity to present fundamental evidence critical to her case."  Petitioners misstate the record.[5]  During the November 26, 2003 hearing, the IJ admitted Wattenberg's Assessment Report into evidence and allowed petitioners' attorney an opportunity to examine Wattenberg beyond the report.  Counsel declined to do so.  Following the government's cross-examination of Wattenberg, the IJ offered petitioners' counsel an opportunity to conduct redirect questioning; counsel again declined.  Petitioners do not claim their representation before the IJ was deficient.  Further, the record reveals that the IJ reviewed Wattenberg's report in detail.  Petitioners received a full and fair opportunity to present their expert testimony.  That the IJ considered Wattenberg's testimony and reasonably discounted its evidentiary weight does not offend the Fifth Amendment.

Finally, petitioners claim that the BIA erred in discounting the new evidence of Zeru's PTSD accompanying the motion to reopen.  The BIA considered that evidence but concluded that

---

[5]  Unfortunately, Zeru has mischaracterized the record throughout her brief, and amici have relied upon those mischaracterizations.

"evidence of [Zeru's] need for psychiatric care in late 2005 is not a sufficient basis to overturn the comprehensive, adverse credibility finding from December 2003." Indeed, petitioners' "new" evidence simply reiterates Wattenberg's previous diagnosis of PTSD. The petitioners' brief concedes that "[a]ll of this information could have been provided by Dr. Wattenberg if she had been given a chance to testify fully" at the asylum hearings. Wattenberg was given that chance. The PTSD diagnosis was considered during the asylum proceedings and before the BIA. We cannot say the BIA erred in holding the additional evidence of Zeru's PTSD did not present "new facts" justifying a motion to reopen. 8 C.F.R. § 1003.2(c)(1); cf. Lemus v. Gonzales, 489 F.3d 399, 401 (1st Cir. 2007). The BIA did not act arbitrarily or capriciously in denying petitioners' motion.

We acknowledge the assistance provided by the brief filed by amici. Zeru and amici correctly argue that the IJ and the BIA, in assessing credibility of aliens who are victims of trauma and consequently suffer from PTSD, should be mindful that serious memory problems are a common symptom of PTSD. See Br. of Amici Curiae in Support of the Pet'rs 18-19. They also correctly argue that expert medical evidence may assist the agency. Id. 27-28.

The record reveals that the BIA and IJ adhered to both principles in this case. The IJ explicitly recognized that trauma victims may give discrepant testimony. The IJ articulated his view

that this did not explain the discrepancies between Zeru's testimony and her report to Wattenberg as to the number of rapes. Zeru's evidence did not dispute this drawing of the line by the IJ. Contrary to Zeru's claim that the BIA rejected the new evidence of Zeru's medical condition in 2005, the BIA carefully considered that evidence, as described.

Amici also join Zeru in arguing that she was not given a fair chance to respond to doubts about her credibility. Not so. There is no presumption that an alien seeking refugee status is credible. Nor is there an assumption that if the IJ has not made an express finding of non-credibility, the alien's testimony must be taken as credible. The burden of persuasion is Zeru's, 8 C.F.R. § 1208.13(a), and that requires her to put forth sufficiently credible testimony or other evidence to establish her eligibility for asylum.

It was, or should have been, self-evident to Zeru and her counsel that there were weaknesses in her case from her presentation of evidence alone. First, on the issue of the number of times she had been raped, she was inconsistent. The inconsistency between her testimony to the IJ on that point and her statements to Wattenberg was obvious. Second, Wattenberg's affidavit attempted to respond by saying that Zeru "recall[ed] feeling dissociated from her body" during the rapes and adverted to avoidance as a symptom of her PTSD. Wattenberg was not barred from

giving further testimony on this point or from explaining the discrepancies. Third, Zeru had the opportunity and means to provide competent corroborative evidence. The documentary evidence she presented appeared to be fraudulent. Fourth, during the course of the hearing, the IJ made it clear he had reason to doubt Zeru's claims. During one colloquy between Zeru and the IJ during the November 23, 2003, hearing, the IJ specifically pressed Zeru on inconsistencies between her testimony and facts contained in the Wattenberg report. For instance, the IJ asked Zeru multiple times whether there were only two rapes during her imprisonment in Ethiopia. The IJ elicited Zeru's unequivocal denial that a third rape had occurred. Thus Zeru herself contradicted what she told Wattenberg. The IJ also asked Zeru whether her father ever owned a pharmacy, as stated in the Wattenberg report. Zeru answered that he did not. As for petitioners' suspect documentary evidence, the IJ indicated during the hearings that he had reason to believe they were fraudulent. These exchanges put petitioners and their attorney on notice of the IJ's misgivings, but petitioners never offered satisfactory explanations for any of these discrepancies.[6]

---

[6] To the extent Zeru and amici argue that as a mechanical matter the IJ must always, before the end of proceedings, articulate a belief that a petitioner is not credible and provide an additional opportunity to respond, we reject the argument. Neither the regulations nor procedural due process require such a procedure. Indeed, it would be unusual.

There may be cases in which the failure by an IJ or the BIA to give due consideration to expert evidence regarding PTSD justifies dislodging a decision of the Board.  Cf. Mukamusoni v. Ashcroft, 390 F.3d 110, 122-23 (1st Cir. 2004).  For the reasons described, this is not such a case.

We affirm the decisions of the BIA.