# United States Court of Appeals
## For the First Circuit

No. 10-2132

AWULACHEW GUTA-TOLOSSA,

Petitioner,

v.

ERIC H. HOLDER, JR., Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE
BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Stahl and Lipez, Circuit Judges.

Eleanor J. Newhoff for petitioner.
Stefanie Notatino Hennes, Trial Attorney, United States
Department of Justice, Civil Division, with whom Tony West,
Assistant Attorney General, Civil Division, and Leslie McKay,
Assistant Director, Office of Immigration Litigation, were on brief
for respondent.

March 16, 2012

**STAHL**, **Circuit Judge**.  Petitioner Awulachew Guta-Tolossa appeals an order of the Board of Immigration Appeals (BIA) affirming the denial of his applications for asylum, withholding of removal, and relief under the Convention Against Torture (CAT).[1] Finding that the BIA failed to address two central issues in this case, we grant Guta-Tolossa's petition for review, vacate the order of removal, and remand.

## I. Facts & Background

The following is a summary of the evidence that Guta-Tolossa presented in support of his application for asylum.  We have limited our review to the administrative record on which Guta-Tolossa's order of removal was based, as required by 8 U.S.C. § 1252(b)(4)(A).

Guta-Tolossa, who was born and raised in Ethiopia, is one of five children.  His mother is of the Amhara ethnic group, and his father is of the Oromo ethnic group.  According to Guta-Tolossa's affidavit, the ethnicity of the father dictates the ethnicity of children in Ethiopia, and Guta-Tolossa is thus considered Oromo.  Guta-Tolossa comes from what he describes as a relatively influential family in the Oromo community.  His paternal grandfather was a local leader in the Oromo community.  His father,

---

[1] We do not address Guta-Tolossa's CAT claim, which we deem waived by his failure to "formulate[] any developed argumentation in support of that claim."  Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010).

for many years, acted as an organizer and recruiter for an Oromo political, social, and cultural organization known as the Mecha Tulema Association (MTA), which was outlawed by the Ethiopian government in July 2004. Guta-Tolossa's brother, Tilahun, was also active with the MTA and distributed pamphlets calling for an end to the oppression of the Oromo people in Ethiopia. Guta-Tolossa himself distributed such pamphlets on several occasions as well.

In September 2004, Tilahun was arrested and detained for thirteen days, during which time he was interrogated and beaten. Guta-Tolossa's mother was able to bribe the police to release Tilahun, who subsequently fled to Qatar. Guta-Tolossa alleges that government agents repeatedly visited his house and conducted searches between September and December 2004. In December 2004, Guta-Tolossa's father was arrested and imprisoned. He has not been seen since. After the arrests of his brother and father, Guta-Tolossa became concerned for his own safety and lived largely away from his family's home.

In February 2005, Guta-Tolossa obtained a new identity document and, with the help of a friend, was able to convince the clerk who issued the document to list his ethnicity as Amhara, which he felt might help protect him in the event of a run-in with government agents. Nonetheless, according to Guta-Tolossa's affidavit, because his last name is unmistakably Oromo, he did not feel safe in Ethiopia. He thus decided to flee the country. Guta-

Tolossa obtained a false passport, and his mother paid someone to help him get out of the country. When he left Ethiopia in April 2005, it was Guta-Tolossa's first time traveling outside of the country. He first flew to Mexico City and, from there, was smuggled in a truck across the U.S.-Mexico border on or about April 15, 2005.

A few days later, U.S. Immigration and Customs Enforcement (ICE) officials arrested Guta-Tolossa near El Paso, Texas. Although Guta-Tolossa could not speak English, the ICE agents questioned him in English, Spanish, and, at some point, in Amharic, his native language. After the interview, he signed a Record of Sworn Statement in English. That statement indicated that Guta-Tolossa did not fear persecution or torture if he returned to Ethiopia. The U.S. Department of Homeland Security (DHS) placed Guta-Tolossa in removal proceedings in El Paso, and he was released on bond. He requested a change of venue, and DHS transferred his case to Boston. In defense of removal, Guta-Tolossa applied for asylum, withholding of removal, and CAT relief, claiming a fear of future persecution in Ethiopia as a result of his political opinion, his membership in a particular social group, and his ethnicity.

Once Guta-Tolossa arrived in Boston, he joined the Coalition for Unity and Democracy (CUD), a coalition of Ethiopian political opposition parties. Guta-Tolossa says he has been active

with the group since July 2006 and has attended CUD demonstrations in Boston, Washington, D.C., and elsewhere.

At his merits hearing before the Immigration Judge (IJ) on October 19, 2007, Guta-Tolossa submitted a variety of reports from news organizations, human rights organizations, and the U.S. Department of State describing country conditions in Ethiopia. Those reports generally corroborated his claims that the Ethiopian government has arbitrarily arrested and detained MTA members. He also submitted: (1) his school completion certificate; (2) his resident identification card, which listed his ethnicity as Amhara; (3) photographs of himself participating in CUD rallies in the United States; and (4) a letter from his brother, Tilahun, confirming that Tilahun had been detained and beaten before fleeing Ethiopia.

During its cross-examination of Guta-Tolossa, the government introduced for impeachment purposes the Record of Sworn Statement that the ICE agents had prepared in Texas, which indicated that Guta-Tolossa did not fear persecution if returned to Ethiopia. At the hearing, Guta-Tolossa testified that he was not able to read or write in English at the time that he was shown and signed the Record of Sworn Statement, that no one read or explained the statement to him before he signed it, that the ICE agents interviewed him both in English and in Amharic, that he did not recall being asked whether he feared persecution if he returned to

-5-

Ethiopia, but that there was also quite a bit he did not remember about that day because of his mental state at the time.

The IJ issued an oral decision that same day and denied Guta-Tolossa's applications for asylum, withholding of removal, and CAT protection. In her findings, the IJ described Guta-Tolossa as "an intelligent, articulate, soft-spoken young man" whose oral testimony was "vague" compared to his "quite detailed" affidavit but "not inconsistent with the affidavit." The IJ noted a "major inconsistency, and there was only one major inconsistency" in the case, which was the discrepancy between Guta-Tolossa's testimony that he feared persecution in Ethiopia and his Record of Sworn Statement, in which he indicated that he did not. The IJ also found that there was "much questioning" at the merits hearing regarding the sworn statement, but she "simply [did] not have enough evidence to determine one way or another" what answer, if any, Guta-Tolossa had provided to the question, "Do you fear persecution or torture if you return to your country?" The IJ did not make an explicit credibility finding.

The "greatest problem" with Guta-Tolossa's asylum application, the IJ went on to say, was "the lack of proof" he had presented. "In this case," the IJ found, "corroborating evidence should have been offered to bolster respondent's detailed claims in his affidavit." The IJ explained that Guta-Tolossa should have provided "corroborating evidence or an explanation for its

unavailability" with regard to: (1) the detentions of his father and brother and the reasons for those detentions; (2) his father's and brother's activities with the MTA; (3) his grandfather's activities within the Oromo community; (4) Guta-Tolossa's claim that he is "from the Oromo region"; and (5) his CUD membership.

The IJ concluded that she could not find, on the record before her, that Guta-Tolossa's brother and father were detained as a result of their activities with the MTA, noting (incorrectly, as it turns out) that the U.S. State Department reports did not mention the MTA.[2] She also determined that Guta-Tolossa's participation in the CUD did not give rise to a well-founded fear of future persecution, a finding that Guta-Tolossa does not challenge on appeal. The IJ therefore denied Guta-Tolossa's applications for asylum, withholding of removal, and CAT relief.

On November 16, 2007, Guta-Tolossa filed an appeal with the BIA. In support of his appeal, Guta-Tolossa submitted a letter dated December 2006 from the Boston-area CUD chapter, confirming that he had been active with the CUD since July 2006. The BIA dismissed his appeal, agreeing with the IJ that Guta-Tolossa had failed to provide sufficient corroborating evidence or a persuasive

---

[2] The IJ seems to have misread the State Department reports that Guta-Tolossa submitted, both of which mention persecution of MTA members by the Ethiopian government. However, because the IJ did not base her decision on the State Department reports, we find the error harmless. Cf. Diab v. Ashcroft, 397 F.3d 35, 41-42 (1st Cir. 2005).

explanation as to why that evidence was not reasonably available. The BIA found that the letter from the CUD was reasonably available at the time of Guta-Tolossa's merits hearing, given that it was dated December 2006 and the hearing occurred in October 2007, and thus did not merit remand.

Guta-Tolossa challenged the BIA's dismissal in two ways. First, on September 23, 2010, he filed a timely petition for review with this court. Then, on September 27, 2010, he filed a timely Motion for Reconsideration and to Reopen Removal Proceedings with the BIA. In support of his motion to the BIA, Guta-Tolossa submitted various documents that the IJ had deemed lacking,[3] including a birth certificate, another letter from the Boston CUD chapter, and affidavits from his mother, sister, and a family friend confirming his father's arrest. On March 25, 2011, the BIA denied Guta-Tolossa's motion to reopen, finding that he had not shown that the corroborating evidence was previously unavailable. Guta-Tolossa's attorney chose not to petition for our review of that decision. Thus, we do not address the BIA's March 25, 2011 decision here, nor can we consider the additional evidence that Guta-Tolossa submitted to the BIA in support of his motion to reopen. See 8 U.S.C. § 1252(b)(4)(A).

---

[3] In its brief on appeal, the government describes the evidence that Guta-Tolossa submitted with his motion to reopen as follows: "Attached to his motion, Guta-Tolossa provided much of the evidence that the agency concluded he should have provided in support of his asylum application."

## II. Discussion

Though our review in asylum cases is typically for substantial evidence, see, e.g., Balachandran v. Holder, 566 F.3d 269, 273 (1st Cir. 2009), this case involves questions of law, which we review de novo, Castañeda-Castillo v. Holder, 638 F.3d 354, 362 (1st Cir. 2011). Where a question is best resolved by the agency in the first instance, or is left primarily in the agency's hands by statute, and the agency has failed to address that question, we generally must remand. INS v. Ventura, 537 U.S. 12, 16-17 (2002); see also Castañeda-Castillo, 638 F.3d at 363; Rasiah v. Holder, 589 F.3d 1, 9 (1st Cir. 2009) (Lipez, J., dissenting).

Guta-Tolossa's briefing on appeal certainly leaves much to be desired. He has supported few of his claims with any developed argumentation and has cited a number of cases without analyzing those cases or applying them to the facts at hand. We find, however, that he has properly raised three arguments. His first argument is that the BIA erred by failing to grant him a presumption of credibility on appeal, as required by 8 U.S.C. § 1158(b)(1)(B)(iii). His second and third arguments relate to the proper construction of a provision of the REAL ID Act of 2005. Guta-Tolossa argues that 8 U.S.C. § 1158(b)(1)(B)(ii) requires an IJ to: (1) make a credibility finding before demanding that an applicant provide corroborating evidence; and (2) give an otherwise credible applicant notice of the need for corroborating evidence,

as well as an opportunity to provide that evidence or explain why it is not reasonably available. Because we find that two of Guta-Tolossa's arguments may be outcome-determinative in this case and are best resolved in the first instance by the BIA, we do not reach his overarching claim that he met his burden of proving his eligibility for asylum and withholding of removal.

We begin with Guta-Tolossa's argument that the BIA erred by failing to grant him a presumption of credibility in analyzing his appeal. On appeal to the BIA, "the applicant or witness shall have a rebuttable presumption of credibility" if the IJ has not made an explicit adverse credibility finding. 8 U.S.C. § 1158(b)(1)(B)(iii); see also Kho v. Keisler, 505 F.3d 50, 56 (1st Cir. 2007). The IJ here described Guta-Tolossa as "an intelligent, articulate, soft-spoken young man," whose oral testimony was "vague" compared to his detailed affidavit but "not inconsistent with the affidavit." She noted only one possible "major inconsistency" in the case: the discrepancy between Guta-Tolossa's testimony at the merits hearing and his Record of Sworn Statement. She concluded that she "simply [did] not have enough evidence to determine one way or another" what Guta-Tolossa's response had been when the ICE agents in Texas asked him whether he feared persecution if returned to Ethiopia.

The government does not allege that the IJ's findings constituted an adverse credibility determination,[4] nor did the BIA interpret them as such. To the extent that the BIA addressed Guta-Tolossa's credibility, it was only to say that "[t]he Immigration Judge indicated that he [sic] did not know what to believe in the instant case and he [sic] did not know whether the respondent was credible." Nevertheless, in analyzing whether the IJ properly determined that Guta-Tolossa had not met his burden of proof, the BIA does not seem to have granted him a presumption of credibility, as required by 8 U.S.C. § 1158(b)(1)(B)(iii). The agency should have reviewed Guta-Tolossa's appeal in light of that presumption, or explained why the presumption did not apply, and that will be its first task on remand.

Because the BIA may conclude that, notwithstanding the presumption of credibility, Guta-Tolossa did not meet his burden of proof, we turn next to Guta-Tolossa's statutory interpretation arguments. The REAL ID Act amended the law regarding credibility and the need for corroborating evidence in asylum cases. The relevant provision of the statute reads as follows:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts

_____

[4] Indeed, in its brief on appeal, the government repeatedly describes Guta-Tolossa's testimony as credible.

-11-

sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

8 U.S.C. § 1158(b)(1)(B)(ii).

Guta-Tolossa's first argument is that 8 U.S.C. § 1158(b)(1)(B)(ii) requires an IJ to make an explicit credibility finding before requesting additional corroboration. Though the BIA did not address that claim in its decision, it need not do so on remand. Under the statute, corroboration is the rule, not the exception. An applicant's testimony, standing alone, will only be sufficient to sustain his burden of proof if his testimony "is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). Thus, we have held that an IJ can require corroboration whether or not she makes an explicit credibility finding, which forecloses Guta-Tolossa's suggestion that a credibility finding is a necessary prerequisite to a request for additional evidence. See, e.g., Chhay v. Mukasey, 540 F.3d 1, 6-7 (1st Cir. 2008) (upholding an IJ's decision that an applicant had failed to meet her burden of proof where the applicant did not provide corroborating evidence, even though the IJ did not make an

-12-

explicit credibility determination); Hayek v. Gonzales, 445 F.3d 501, 505, 507-08 (1st Cir. 2006) (same); cf. Dehonzai v. Holder, 650 F.3d 1, 9 n.9 (1st Cir. 2011) (noting that "'corroborating evidence may be used to bolster an applicant's credibility'" where the applicant "'is found not to be entirely credible'" (quoting Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005))); Morgan v. Holder, 634 F.3d 53, 57 (1st Cir. 2011) (holding that an explicit credibility determination is not necessary where the alien's testimony is insufficient to compel an entitlement to relief). Guta-Tolossa makes no attempt to distinguish those cases or to point us to others supporting his position. His claim therefore fails.

Guta-Tolossa's second statutory interpretation argument relates to the final sentence of section 1158(b)(1)(B)(ii). See 8 U.S.C. § 1158(b)(1)(B)(ii) ("Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence."). As Guta-Tolossa reads that statutory text, where an IJ finds that an asylum applicant is otherwise credible but that more evidence is necessary to corroborate his claim, section 1158(b)(1)(B)(ii) requires the IJ to provide the applicant with notice of the need for corroborating evidence, as well as an

opportunity to provide the evidence or to explain why it is not reasonably available. The BIA also failed to address this claim.

Though three other circuits have recently grappled with whether the REAL ID Act requires an IJ to provide an otherwise credible applicant with notice of the need for corroborating evidence,[5] it is a question of first impression for us. In its brief on appeal, the government has invoked our holding in Zeru v. Gonzales, 503 F.3d 59 (1st Cir. 2007), that an IJ need not "always, before the end of proceedings, articulate a belief that a petitioner is not credible and provide an additional opportunity to respond," id. at 74 n.6, but Zeru is not directly on point, for three reasons. First, in Zeru, we were not purporting to interpret the language of section 1158(b)(1)(B)(ii). Second, the IJ found the applicant not credible in Zeru, id. at 62, so any notice requirement in section 1158(b)(1)(B)(ii) would not have been triggered, see 8 U.S.C. § 1158(b)(1)(B)(ii) (referring to evidence necessary to corroborate "otherwise credible testimony"). Third, in Zeru, the IJ made it clear during the hearing that he had reason to doubt the applicant's claims, repeatedly asked the applicant

_____

[5] The Second and Seventh Circuits have concluded that it does not. See Liu v. Holder, 575 F.3d 193, 198 (2d Cir. 2009); Rapheal v. Mukasey, 533 F.3d 521, 530 (7th Cir. 2008). The Ninth Circuit, on the other hand, has held that the plain language of section 1158(b)(1)(B)(ii) does require that an applicant be given notice of the need for corroborating evidence, as well as an opportunity to provide that evidence or to explain why he cannot do so. Ren v. Holder, 648 F.3d 1079, 1090-93 (9th Cir. 2011).

-14-

about inconsistencies in her testimony, and indicated that he believed the applicant's documentary evidence was fraudulent. 503 F.3d at 73-74. We have identified no similar exchanges on this record that would have put Guta-Tolossa "on notice of the IJ's misgivings."[6] Id. at 74.

There is, however, a threshold issue. If section 1158(b)(1)(B)(ii) does include a notice requirement, the requirement would only apply where an IJ finds an applicant's testimony "otherwise credible." 8 U.S.C. § 1158(b)(1)(B)(ii). That, in turn, presents a question of statutory interpretation: whether the IJ must explicitly find an applicant's testimony "otherwise credible" on the record, or whether such a finding may be inferred from the whole of the IJ's decision. We leave that question to the BIA to resolve in the first instance. See, e.g., Ventura, 537 U.S. at 16 ("Generally speaking, a court of appeals should remand a case to an agency for decision of a matter that

---

[6] At the close of Guta-Tolossa's testimony, the IJ asked Guta-Tolossa's attorney whether she had any additional witnesses or evidence to offer. The government argues that the IJ's inquiry, combined with the cross-examination that had just occurred regarding the inconsistency between Guta-Tolossa's testimony and his Record of Sworn Statement, put Guta-Tolossa on notice that more was necessary to substantiate his claim. As we read the transcript, however, the IJ's question was a standard confirmation that Guta-Tolossa had finished presenting his case, not a veiled message that the IJ expected more evidence. Furthermore, the IJ's statement must be read in conjunction with the fact that she repeatedly asked Guta-Tolossa's attorney, during the hearing, how many more questions the attorney had and suggested that the attorney "streamline those questions."

statutes place primarily in agency hands."); <u>Walker</u> v. <u>Holder</u>, 589 F.3d 12, 21 (1st Cir. 2009) (holding that "statutory interpretation is, in the first instance, the prerogative of the agency charged with interpreting the statute"). If the BIA concludes that the IJ must make an explicit, affirmative credibility finding on the record in order for section 1158(b)(1)(B)(ii) to be implicated, it seems clear that no such finding was made here and therefore no notice requirement could have been triggered.

If, however, the BIA adopts the latter interpretation of the statute, it will need to determine whether it is possible to infer from the IJ's decision that she found Guta-Tolossa's testimony "otherwise credible" within the meaning of section 1158(b)(1)(B)(ii).[7] On the one hand, the IJ described Guta-Tolossa as an "intelligent, articulate, soft-spoken young man," whose testimony was "not inconsistent with" his "detailed affidavit." On the other hand, she characterized his testimony as "vague" and was clearly concerned about the possible "major inconsistency" between

---

[7] The BIA's conclusion that "[t]he Immigration Judge indicated that he [sic] did not know what to believe in the instant case and he [sic] did not know whether the respondent was credible" did not suffice in this regard. That finding by the BIA did not specifically address whether the IJ found Guta-Tolossa's testimony "otherwise credible" under section 1158(b)(1)(B)(ii). As discussed above, although the IJ expressed concern about the Record of Sworn Statement, it would be reasonable to infer that she viewed the remainder of Guta-Tolossa's testimony as credible, given her comments about his demeanor and her observation that there was no other significant inconsistency in his testimony. The BIA, of course, may choose to remand the case to the IJ for clarification of the credibility determination.

his Record of Sworn Statement and his testimony at the merits hearing.  Yet she did not make an adverse credibility finding as a result of that inconsistency,[8] and she emphasized that "[t]he greatest problem with [Guta-Tolossa's] application" was "the lack of proof" he had presented.  One can thus read the IJ's decision as finding that corroborating evidence was necessary to bolster Guta-Tolossa's "otherwise credible" testimony, which would have implicated section 1158(b)(1)(B)(ii)'s notice requirement, if such a requirement exists.  However, one can also read the IJ's decision as finding that corroborating evidence was necessary for her to determine whether Guta-Tolossa's testimony was in fact credible, in which case any notice requirement in section 1158(b)(1)(B)(ii) would not have been triggered.

Depending on how the BIA answers that question, it may then need to consider the merits of Guta-Tolossa's claim that there is a notice requirement implicit in section 1158(b)(1)(B)(ii).

---

[8] That may be because the IJ found the inconsistency understandable.  Describing his interrogation by the ICE agents (which occurred in English, Spanish, and eventually in Amharic), Guta-Tolossa testified at the merits hearing that he was "so much intimidated" and "very fearful" at the time and that he "wasn't even sure of the answers that [he] was giving."  Though Guta-Tolossa did testify that the ICE agents at some point interviewed him in Amharic, he said that he did not remember the Amharic translator specifically asking him whether he feared persecution if returned to Ethiopia.  When asked why his signature nonetheless appeared on the Record of Sworn Statement, Guta-Tolossa responded, "At that time, there were two soldiers that were showing me where to sign.  And that was simply what I was doing and nobody explained to me what was on the paper that I was signing."

### III. Conclusion

We thus grant the petition for review, vacate the order of removal, and remand for the BIA to address: (1) whether, in light of the rebuttable presumption of credibility to which Guta-Tolossa is entitled on appeal, see 8 U.S.C. § 1158(b)(1)(B)(iii), the IJ properly concluded that Guta-Tolossa had not met his burden of proving his eligibility for asylum or withholding of removal; (2) if the IJ properly determined that more proof was necessary, whether the IJ found that Guta-Tolossa's testimony was "otherwise credible" within the meaning of 8 U.S.C. § 1158(b)(1)(B)(ii); and (3) if the IJ found that Guta-Tolossa's testimony was "otherwise credible," whether section 1158(b)(1)(B)(ii) required the IJ to provide Guta-Tolossa with notice of the need for corroborating evidence and an opportunity to provide that evidence or explain why it was not reasonably available.[9]

If the BIA interprets the statute as requiring that an otherwise credible applicant receive some notice of the need for corroborating evidence and an opportunity to respond, the agency will of course have to reconsider Guta-Tolossa's appeal in light of that interpretation.

So ordered.

---

[9] Because the interpretation of the statutory text is an issue of law, if we are asked to review the BIA's ultimate conclusion, we will do so de novo, giving deference to the agency's interpretation if it is reasonable. See, e.g., Castañeda-Castillo, 638 F.3d at 362.