# United States Court of Appeals
## For the First Circuit

No. 11-1925

JIANLI CHEN,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

No. 12-1250

JIANLI CHEN AND MIN FEN HU,

Petitioners,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITIONS FOR REVIEW OF ORDERS OF THE

BOARD OF IMMIGRATION APPEALS

Before

Lynch, Chief Judge,
Selya and Stahl, Circuit Judges.

Gang Zhou on brief for petitioners.

Tony West, Assistant Attorney General, Civil Division, Stuart F. Delery, Acting Assistant Attorney General, Richard M. Evans, Assistant Director, Office of Immigration Litigation, and Kevin J. Conway, Attorney, on brief for respondent.

---

December 21, 2012

---

**SELYA**, **Circuit Judge**.  The petitioners, Jianli Chen and her husband, Min Fen Hu, are Chinese nationals.  They seek judicial review of the final orders of the Board of Immigration Appeals (BIA) (i) affirming the denial of their applications for asylum, withholding of removal, and relief under the United Nations Convention Against Torture (CAT); and (ii) denying their motion for reconsideration.  Chen appears both as an applicant for relief in her own right and as a derivative beneficiary of her husband's application.  After careful consideration, we leave the BIA's orders intact.

## I.  BACKGROUND

Hu entered the United States without inspection on December 1, 2005.  Chen followed suit on March 8, 2006.  Federal authorities subsequently placed them in removal proceedings.  See 8 U.S.C. §§ 1182(a)(6)(A)(i), 1229a(a)(2).  Both petitioners conceded removability and cross-applied for asylum, withholding of removal, and CAT relief.  Their cases were consolidated for hearing before an immigration judge (IJ).

We rehearse the facts in line with the petitioners' direct testimony.  Chen and Hu were married in China on November 14, 2001.  On January 13, 2003, Chen gave birth to their first child (a daughter).  Approximately two months later, government functionaries directed the implantation of an intrauterine device

(IUD) in Chen, pursuant to China's coercive population control policy.

Chen and Hu went through a sham divorce in order to avoid the annual pregnancy checks required for all married women. Chen then asked a private physician to remove the IUD so that she could bear a second child. She became pregnant and, to conceal her condition from the authorities, she hid at her uncle's home. Despite this professed need for secrecy, the petitioners traveled openly to Thailand for a vacation, securing visas and passing through customs.

During this pregnancy, Chen skipped the mandatory gynecological examinations routinely scheduled by the municipal family planning office. Nevertheless, she voluntarily underwent two ultrasound examinations, including one at a provincial hospital run by the Chinese government.

When family planning officials concluded that Chen was trying to dodge the population control policy, they took her mother into custody and Chen was informed that her mother would be held indefinitely unless Chen allowed a pregnancy check to be performed. Chen capitulated: on August 23, 2005 (shortly after returning from the Thailand vacation), she was examined, found to be pregnant, and subjected to a forced abortion.

In mid-October, Hu left China. He flew from Beijing to Paris and then traveled to Venezuela, where he remained for three

-4-

days. Thereafter, he spent two months traveling to the United States by boat, vehicle, and on foot. Almost immediately after his arrival, the Department of Homeland Security commenced removal proceedings against him in the New York immigration court.

Chen left China three days after Hu. She remained in Venezuela for five months before traveling to the United States through Mexico. She arrived in March of 2006 and, in short order, removal proceedings were instituted against her.

On May 17, 2006, the petitioners remarried in the United States. Roughly two-and-one-half years later, Chen gave birth to a second child (a son) in New York.

In the removal proceedings, the petitioners conceded the foundational factual allegations but insisted that, if repatriated, they would be subjected to involuntary sterilization. When they moved to Springfield, Massachusetts, the cases were transferred to Boston.

Following an evidentiary hearing, the IJ determined that the petitioners' testimony was not believable and that, therefore, their factual account could not be credited. With these determinations in mind, the IJ concluded that the petitioners had failed to establish either past persecution or a well-founded fear of future persecution. Consequently, she rejected the petitioners' cross-applications for relief and ordered them removed to China.

The petitioners appealed to the BIA, which upheld the IJ's adverse credibility determinations and affirmed the IJ's rulings save for a perceived need to remand Hu's asylum application for findings as to whether he suffered past persecution. The petitioners moved for reconsideration, arguing that the BIA had improvidently fashioned its own factual findings in order to uphold the adverse credibility determinations. The BIA rebuffed this argument, stating that its prior decision did not "incorporate[] or rel[y] . . . on any improper factfinding."

In the same motion, the petitioners sought reconsideration of the remand order. The BIA reconsidered this issue and withdrew the remand order, accepting Hu's representation that he did not wish to pursue the issue of past persecution.

The petitioners have now sought judicial review.[1] We have jurisdiction under 8 U.S.C. § 1252(a)(1).

## II. ANALYSIS

Our analysis necessarily begins with the standard of review, which is complicated here because the petitioners have challenged both the BIA's original decision and its partial denial of their motion for reconsideration. Withal, the issues are essentially the same and, for ease in exposition, we assume,

---

[1] Chen filed a petition for judicial review while the motion for reconsideration was pending before the BIA. Chen and Hu jointly filed a second petition after the BIA disposed of the motion for reconsideration. We have consolidated the two petitions and it is not necessary for us to distinguish between them.

without deciding, that the more petitioner-friendly substantial evidence standard applies to those issues.[2]

The substantial evidence standard pertains to the review of factual findings, including credibility determinations. Segran v. Mukasey, 511 F.3d 1, 5 (1st Cir. 2007). Viewing the evidence through this deferential lens, we will reverse only if the record is such as to compel a reasonable factfinder to reach a contrary determination. Pan v. Gonzales, 489 F.3d 80, 85 (1st Cir. 2007). In other words, findings of fact will stand as long as they are "supported by reasonable, substantial, and probative evidence on the record considered as a whole." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotation marks omitted).

Rulings of law are a different matter. Such rulings engender de novo review, but with some deference to the agency's reasonable interpretation of statutes and regulations that fall within its sphere of authority. See Seng v. Holder, 584 F.3d 13, 17 (1st Cir. 2009); see also Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-44 (1984).

In the immigration context, judicial review ordinarily focuses on the BIA's decision. See, e.g., Seng, 584 F.3d at 17. But where, as here, the BIA adopts portions of the IJ's findings while adding its own gloss, we review both the IJ's and the BIA's

---

[2] The standard of review applicable to the denial of a motion for reconsideration is abuse of discretion. See INS v. Doherty, 502 U.S. 314, 323-24 (1992).

-7-

decisions as a unit.  Villa-Londono v. Holder, 600 F.3d 21, 23 (1st Cir. 2010).

To qualify for asylum, an alien must establish that he is a refugee within the meaning of 8 U.S.C. § 1101(a)(42).  Carrying this burden requires a showing of either past persecution or a well-founded fear of future persecution.  See id. § 1101(a)(42)(A); see also Rivas-Mira v. Holder, 556 F.3d 1, 4 (1st Cir. 2009).

The immigration statutes take special account of persons who are forced to flee their homeland because of coercive family planning policies.  The law provides in pertinent part that the term "refugee" shall include "a person who has been forced" through government action "to abort a pregnancy or to undergo involuntary sterilization."  8 U.S.C. § 1101(a)(42)(B).

An asylum-seeker's testimony alone, if credible, may suffice to carry the burden of establishing refugee status.  See Bebri v. Mukasey, 545 F.3d 47, 50 (1st Cir. 2008).  But the factfinder need not take an asylum-seeker's testimony at face value; rather, the factfinder may discount such testimony, or disregard it entirely, if she reasonably deems it to be "speculative or unworthy of credence."  Id.

Against this backdrop, we turn to the case at hand. There is no question that the petitioners' account, if true in all its particulars, could support a claim for asylum.  The problem is that the factfinder — the IJ — did not believe the petitioners'

story; and if that story is set to one side, the record contains no basis for granting asylum. Thus, our inquiry focuses on the propriety of the adverse credibility determinations.

Before undertaking this inquiry, we pause to note that the IJ's adverse credibility determinations are governed by the provisions of the REAL ID Act, Pub. L. No. 109-13, 119 Stat. 302 (2005), codified at 8 U.S.C. § 1158(b)(1)(B)(iii). This statute provides that a factfinder

> may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

8 U.S.C. § 1158(b)(1)(B)(iii).[3] We proceed to evaluate the adverse credibility determinations under these guidelines and in light of the totality of the circumstances. See Rivas-Mira, 556 F.3d at 4.

---

[3] This standard is less petitioner-friendly than its predecessor, which demanded that an adverse credibility determination be based on inconsistencies that "pertain to facts central to the merits of the alien's claims." Bebri, 545 F.3d at 50 (quoting Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006)).

The petitioners advance two broad claims of error with respect to the denial of asylum. Their first attack is procedural; it posits that the BIA engaged in improper factfinding to sustain the adverse credibility determinations. Their second attack is substantive; it posits that both the IJ and the BIA arbitrarily denigrated their testimony and, thus, erred in rejecting their claims for asylum based on a well-founded fear of future persecution. We examine these challenges sequentially. We then address some miscellaneous matters.

## A. **The Procedural Claim**.

To place into perspective the petitioners' argument that the BIA overstepped its bounds by engaging in independent factfinding, it is necessary to understand the relative roles of the IJ and the BIA in the decisional process. The IJ has the front-line duty of finding the facts. Her factual findings, including credibility determinations, are reviewed by the BIA only to ensure that they are not clearly erroneous. See 8 C.F.R. § 1003.1(d)(3)(i). Although the BIA may take "administrative notice of commonly known facts such as current events or the contents of official documents," it is prohibited from "engag[ing] in factfinding in the course of deciding appeals." Id. § 1003.1(d)(3)(iv). The petitioners say that, in this instance, the BIA usurped the role of the IJ.

At the outset, the petitioners take issue with the BIA's statement that the IJ found their testimony "internally inconsistent." The IJ, they say, never made any finding of internal inconsistency.

This hair-splitting is unpersuasive. Although the IJ did not use the phrase "internally inconsistent" to describe the petitioners' testimony, her findings justify the use of that description. In her analysis, the IJ refers to "diverging answers," "discrepancy," and "dissonance" in the petitioners' testimony. These findings fit comfortably under the carapace of internal inconsistency.

Let us be perfectly clear. Although the BIA may not engage in independent factfinding, it has the prerogative — indeed, the duty — of examining the basis for, and then synthesizing and analyzing, the IJ's findings. See Rotinsulu v. Mukasey, 515 F.3d 68, 73 (1st Cir. 2008). This multifaceted role is not meant to be robotic. The BIA is not bound simply to parrot the precise language used by the IJ but, rather, may use its own vocabulary.

In pursuing this claim of procedural error, the petitioners also assail the BIA's statement that Hu's credibility was suspect because he denied that he was ever questioned by border patrol agents. The premise of the petitioners' attack is the assumption that the BIA could not reasonably rely on Hu's I-213 form because that form does not indicate on its face whether a

-11-

Chinese-language interpreter capable of a dialect understandable to Hu was provided.[4]

We reject this contention. Strict rules of evidence do not apply in immigration proceedings. See Henry v. INS, 74 F.3d 1, 6 (1st Cir. 1996). It is normally enough if the IJ reasonably finds a proffered piece of evidence to be reliable and its use to be fundamentally fair. See Yongo v. INS, 355 F.3d 27, 30 (1st Cir. 2004). The I-213 form at issue here satisfies these criteria, and the IJ found as much.

At the hearing before the IJ, Hu at first denied speaking to the border patrol agents at all. He then retreated to the position that he had answered only a few routine questions. The IJ credited the I-213 form, stating that it was "sufficiently reliable on [its] face" and "was compiled with the aid of a telephonic interpreter." These findings are supported by the record.

Relatedly, the petitioners maintain that the BIA improperly supplemented the IJ's findings with respect to the likelihood of forced sterilization in China. Specifically, they point to the BIA's statement that they "have not shown that having two children born almost six years apart violates their village's family planning policy." They overlook, however, that this

---

[4] An I-213 form is the form customarily prepared by border patrol agents incident to an alien's apprehension at the border.

statement is followed by a citation to a designated portion of the IJ's decision and is simply a paraphrasing of the IJ's language.

For these reasons, the petitioners' procedural claim fails. Simply put, the BIA did not engage in independent factfinding.

## B. **The Substantive Claim**.

We turn next to the petitioners' substantive claim of error, which frontally challenges the adverse credibility determinations. The petitioners start by questioning the agency's reliance on omissions from their testimony. They insist that they were entitled to, but did not receive, an opportunity to explain any supposed omissions. Cf. Zeru v. Gonzales, 503 F.3d 59, 69-70 (1st Cir. 2007) ("An IJ's credibility determinations demand deference where (1) the discrepancies and omissions described by the IJ are actually present in the record; (2) those discrepancies and omissions provide specific and cogent reasons to conclude that the petitioners provided incredible testimony regarding facts central to the merits of the asylum claim; and (3) petitioners do not provide a convincing explanation for the discrepancies and omissions.").

This argument is jejune. The petitioners have had multiple opportunities, such as in their briefing to the BIA and to this court, to explain the omissions. Despite these multiple

-13-

opportunities, the explanations that they have advanced are unconvincing.

This brings us to the petitioners' central theme: that the adverse credibility determinations are clearly erroneous. The critical question, of course, is whether those determinations are supported by substantial evidence in the record as a whole. See Pan, 489 F.3d at 85. We answer this question affirmatively.

A trial judge sees and hears the witnesses at first hand and is in a unique position to evaluate their credibility. In the absence of special circumstances — not present here — reviewing courts ordinarily should defer to such on-the-spot judgments. See, e.g., Ang v. Gonzales, 430 F.3d 50, 57 (1st Cir. 2005); Aguilar-Solis v. INS, 168 F.3d 565, 570-71 (1st Cir. 1999). This is especially true when, as in this case, the trial judge fortifies her findings with particularized observations as to demeanor and examples of inconsistencies and implausibilities. See Olujoke v. Gonzales, 411 F.3d 16, 21-22 (1st Cir. 2005); Laurent v. Ashcroft, 359 F.3d 59, 64 (1st Cir. 2004). We illustrate briefly.

Here, the IJ observed that both petitioners were "evasive and equivocal during certain crucial portions of their testimony;" that both "testified in a furtive and incomplete manner when asked about their infiltration into the United States;" and that both "were non-responsive to important queries." Chen, in particular, "appeared to stonewall the fact-finding process." Although it is

-14-

difficult to assess demeanor-based findings from a paper record, we discern nothing in the hearing transcript that undercuts the IJ's detailed observations.

The IJ also identified a litany of inconsistencies and implausibilities in the petitioners' tale. For example, Chen testified that she hid at her uncle's house in order to elude detection by Chinese government officials, yet she proceeded to leave this safe haven to take an eight-day vacation with Hu in Thailand. Further, the IJ remarked Chen's "opaque and inconsistent" testimony as to why she scheduled an ultrasound examination at a government-run hospital instead of an available private facility.[5]

The IJ had obvious difficulty in swallowing Chen's testimony about her forced abortion. Chen originally testified inconsistently as to whether the abortion was or was not performed on the same day that a pregnancy check revealed her gravidity (August 23, 2005). The IJ reasonably concluded that a discrepancy relating to so central a fact was telling.

Similar inconsistencies plagued Chen's description of the logistics of her entry into the United States. She testified at

_____

[5] Chen initially testified that the hospital was not interested in enforcing China's one-child policy; she later testified that she went to the government-run hospital because everyone else went there. The IJ supportably found that neither answer sufficiently explained why Chen would voluntarily repair to a government-run facility, thereby risking detection of her pregnancy by family planning officials.

-15-

one point that she agreed to pay a smuggler $70,000, giving him $1,000 and promising to pay the balance from her earnings in the United States. She subsequently testified, however, that Hu's father sold one of his homes in China to pay the smuggler's fee. Although the petitioners have attempted to provide an explanation for this discrepancy, the IJ concluded that these "starkly different answers" were irreconcilable, and we cannot say that the evidence would compel a reasonable factfinder to reach a contrary conclusion.

The IJ identified comparable inconsistencies and implausibilities in Hu's testimony, particularly with respect to his entrance into the United States and his subsequent apprehension. For example, when asked if border patrol agents interviewed him on December 2, 2005, Hu initially claimed that the agents had not asked him any questions. Later on, he backtracked, stating that the agents had only asked him about his parents, his geographic origins, and his age. The IJ reasonably concluded that both of these answers were false. As she pointed out, the veracity of this account was called into serious question by the broader range of information contained in his I-213 form.

This is part of a larger picture. The IJ's doubts about the petitioners' credibility were compounded by a painstaking comparison of their hearing testimony with both their written

-16-

applications for asylum and their I-213 forms. The IJ compiled a long list of such discrepancies. We offer a sampling.

- Despite their hearing testimony, neither Hu nor Chen asserted in their I-213 forms that they had any children.

- Chen's asylum application and hearing testimony were materially inconsistent as to when she learned of China's one-child policy.

- Chen's asylum application states that on one occasion family planning officials came to her parents' home and questioned her mother about Chen's whereabouts and, on another occasion, barged into her parents' house to search for her. Chen's testimony before the IJ did not mention either of these alleged incidents.

- Chen's I-213 form memorializes that she told the border patrol agents that she entered the United States to seek employment and did not fear returning to China. She testified, however, that she came to the United States to escape China's coercive population control policy and that she feared returning there.

The record contains other inconsistencies as well. For instance, Hu's testimony during the hearing as to the route he took

-17-

in journeying from China to the United States did not match the description of his journey contained in his I-213 form (omitting, among other things, any mention of his stop in Cuba).

To cinch matters, the record is pockmarked with implausibilities. For example, the petitioners never satisfactorily explained why they would opt for a holiday in Thailand, risking official scrutiny, if Chen was hiding from the government. By like token, they never satisfactorily explained either Chen's decision to use a government-run hospital instead of an available private facility or why they traveled separately to reach the United States and took different routes in doing so. The IJ was entitled to give weight to the absence of plausible explanations. See, e.g., Bebri, 545 F.3d at 49; Aguilar-Solis, 168 F.3d at 571.

While some of the discrepancies identified by the IJ may be picayune if viewed in isolation, the record as a whole presents a picture consistent with the IJ's adverse credibility determinations. Fairly viewed, this may well be a situation in which the whole is greater than the sum of its parts. See Pan, 489 F.3d at 86 (explaining that even though inconsistencies "may seem like small potatoes," their cumulative effect may be great); cf. Bourjaily v. United States, 483 U.S. 171, 179-80 (1987) (acknowledging that the "sum of an evidentiary presentation may well be greater than its constituent parts"). In the last

-18-

analysis, it is for the IJ, not this court, to decide whether omissions are significant, whether inconsistencies are telling, and whether implausibilities should be accorded decretory significance. See Kho v. Keisler, 505 F.3d 50, 56 (1st Cir. 2007) (explaining that "[t]he court reviews agency proceedings but does not act as a finder of fact itself").

The petitioners further complain that the agency relied on unfavorable portions of documentary exhibits, including the 2007 U.S. Department of State Country Report on Human Rights Practices in China and the Lianjiang County Family-Planning Information Promotion Q&A for General Public. As the petitioners see it, the agency should have focused on more favorable reports or, at least, on more favorable passages from the cited reports.

This plaint is unfounded. Just as a factfinder may sift through conflicting testimony, accepting some testimony and rejecting other testimony, so too may a factfinder sift through relevant documents, determining which documents are persuasive and which statements within a particular document should be given weight. See Pan, 489 F.3d at 87 & n.6 (citing Martinez v. INS, 970 F.2d 973, 975 (1st Cir. 1992)). In such matters, a court must defer to the factfinder's reasonable choices.

There is one loose end. The petitioners seem to suggest, albeit obliquely, that the agency erred in concluding that they had not established a well-founded fear of persecution based on the

-19-

birth of their second child in the United States.  This suggestion

lacks force.  As the Second Circuit explained, the BIA

> has declined to construe the statutory term
> "refugee" to exclude or to include <u>all</u> Chinese
> nationals who have fathered or given birth to
> more than one child.  Rather, it has
> determined that a case-by-case review is
> necessary to identify which Chinese nationals
> with two or more children demonstrate a fear
> of future persecution that is both
> subjectively genuine and objectively
> reasonable.

<u>Shao</u> v. <u>Mukasey</u>, 546 F.3d 138, 142 (2d Cir. 2008).

In this instance, documentary evidence cited by the IJ

contradicts the claim of a well-founded fear of persecution based

on the birth of the petitioners' second child in the United States.

For example, the IJ supportably relied on the 2007 U.S. Department

of State China Profile of Asylum Claims and Country Conditions

¶ 112, which states in pertinent part that, with respect to the

petitioners' home province, "children born abroad . . . are not

considered as permanent residents of China, and therefore are not

counted against the number of children allowed under China's family

planning law."  Here, too, the burden of persuasion was on the

petitioners, and the record as a whole does not compel a contrary

conclusion.

We have said enough about the asylum claims.  Given the

myriad inconsistencies in the petitioners' testimony, the

implausibilities inherent in their account, their failure to offer

convincing explanations of seeming contradictions, and the IJ's

detailed demeanor-related observations, we hold that the adverse credibility determinations are supported by substantial evidence. This holding, in turn, defeats the asylum claims. Stripped of the petitioners' undependable testimony, the record contains no evidence sufficient to ground the petitioners' professed fear of future persecution: a factfinder cannot reliably tell what really happened in China before the petitioners fled, nor can a factfinder reliably forecast what may await them upon their repatriation. The petitioners have the burden of proof and, on this scumbled record, we cannot say that the agency erred in concluding that they failed to carry it.

## C. **Other Relief**.

We need not linger long over the petitioners' claims for withholding of removal. Claims for asylum and claims for withholding of removal have similar elements, but the quantum of proof required for the latter is more demanding. Compare 8 U.S.C. § 1101(a)(42)(A) and id. § 1158(b), with id. § 1231(b)(3) and 8 C.F.R. § 208.16(b). Thus, an alien who cannot establish the elements of an asylum claim cannot prevail on a counterpart claim for withholding of removal. See Ying Jin Lin v. Holder, 561 F.3d 68, 74 (1st Cir. 2009); Segran, 511 F.3d at 7. That principle applies here.

This leaves the petitioners' CAT claims. It is settled beyond hope of contradiction that claims perfunctorily advanced in

skeletal fashion are deemed abandoned.  <u>See</u>, <u>e.g.</u>, <u>Jiang</u> v. <u>Gonzales</u>, 474 F.3d 25, 32 (1st Cir. 2007); <u>United States</u> v. <u>Zannino</u>, 895 F.2d 1, 17 (1st Cir. 1990).  Because the petitioners have offered no developed argumentation in support of their CAT claims, we reject them out of hand.

## III.  CONCLUSION

We need go no further.  The petitions for judicial review are denied.

**<u>So Ordered</u>**.