# United States Court of Appeals
## For the First Circuit

No. 13-2254

MOHAMED OSMAN AHMED,

Petitioner,

v.

ERIC H. HOLDER, JR., ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF THE

BOARD OF IMMIGRATION APPEALS

Before

Thompson, Selya and Lipez,
Circuit Judges.

Robert Huntington on brief for petitioner.
Stuart F. Delery, Assistant Attorney General, Civil Division,
Blair T. O'Connor, Assistant Director, and Joseph D. Hardy, Trial
Attorney, Office of Immigration Litigation, United States
Department of Justice, on brief for respondent.

September 2, 2014

**SELYA, <u>Circuit Judge</u>.** Over half a century ago, an impresario named Ralph Edwards shot to fame as the host of a radio show called "Truth or Consequences." The lesson of the show was that playing fast and loose with the truth will often backfire and produce undesirable results. That lesson has continuing relevance today.

In this case, the immigration judge (IJ) and the Board of Immigration Appeals (BIA), prompted by what they plausibly perceived to be the petitioner's pernicious pattern of prevarication, refused to grant relief from removal. After careful consideration of the agency's findings and the consequences to the petitioner that flow from those findings, we discern no basis for a favorable exercise of our power of judicial review.

The background facts are easily assembled. The petitioner, Mohamed Osman Ahmed, is a Somalian national who originally entered the United States in 1983 on a student visa and overstayed. Seven years later, he applied for asylum, professing a fear of persecution rooted in his alleged association with two groups to which the reigning Somali dictator Mohamed Siad Barre was opposed: the Somali Salvation Democratic Front (SSDF) and the Majerteen clan. The application languished.

Five years later, the petitioner traveled to Canada and applied for asylum there under a different name (Suudi Mahad Ishaq) and on a somewhat different basis: a fear of persecution because

the United Somali Congress (USC) purportedly wanted to eliminate members of the Majerteen clan. This petition met an abrupt end in 1996, when the petitioner returned to the United States.

United States Border Patrol agents in Vermont discovered the petitioner in the company of several naturalized Canadians of Somali origin who had recently been denied entry into the United States from Canada. The petitioner and his travel companions gave inconsistent answers about their agenda, raising agents' suspicions. Consultation with Canadian immigration authorities revealed the existence of the Canadian asylum application that the petitioner had filed under his nom de guerre. Canadian authorities summarily canceled the petitioner's Canadian asylum application as fraudulently filed.

We fast-forward to 2000, when the federal government charged the petitioner with removability as an alien present without having been admitted or paroled after inspection. See 8 U.S.C. § 1182(a)(6)(A)(i). The petitioner responded in June of 2001 by filing a new application requesting asylum (his first asylum application having been deemed abandoned when he decamped for Canada), withholding of removal, and protection under the United Nations Convention Against Torture (CAT). Along with this new application came a new justification: fear of persecution in Somalia at the hands of al-Shabaab, a militant group known for violent attacks on Sufi Muslims.

There followed a long road of procedural twists and turns, which we need not chart (except to note that the petitioner, through counsel, conceded in written pleadings that he was present in the United States without having been admitted or paroled after inspection).  At the end of this road, the IJ denied all the petitioner's requests for relief and ordered him removed to Somalia.  The IJ premised his decision on an adverse credibility determination, explaining that the petitioner had been guilty of "considerable inconsistencies, omissions, and untruths."

The BIA affirmed in all respects (including affirmance of the IJ's refusal to allow the petitioner to amend his pleadings). This petition for judicial review followed.

Before us, the petitioner argues that the agency (i) erroneously denied him relief from removal, (ii) improperly refused to let him amend his pleadings, and (iii) abridged his due process rights.  We address these arguments sequentially.

We begin with the petitioner's flagship contention: that both the IJ and the BIA applied the wrong legal standard in denying his application for asylum.  Specifically, he asserts that the agency made its adverse credibility determination by applying the relevant provision of the REAL ID Act of 2005, see 8 U.S.C. § 1158(b)(1)(B)(ii)-(iii), whereas it should have applied pre-existing law.  We review this claim of legal error de novo.  See Jianli Chen v. Holder, 703 F.3d 17, 21 (1st Cir. 2012).  Because

-4-

the BIA wrote separately while also approving the IJ's decision, our review is directed at both of those decisions. See id.

A brief historical preface helps to focus the petitioner's argument. For many years, adverse credibility determinations in immigration cases were governed by the so-called "heart of the matter" rule. See, e.g., Seng v. Holder, 584 F.3d 13, 18 & n.2 (1st Cir. 2009); Bebri v. Mukasey, 545 F.3d 47, 50 & n.1 (1st Cir. 2008). In 2005, however, Congress enacted the REAL ID Act. See Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 302, 303. That Act eased the requirements for making adverse credibility determinations, but the new standard was meant to apply only prospectively to applications for asylum filed after May 11, 2005. See Bebri, 545 F.3d at 50 n.1.

In this case, all parties acknowledge that the operative application for asylum was filed prior to May 11, 2005. Thus, the earlier, more alien-friendly "heart of the matter" rule applies. See id. Apparently cognizant of this chronology, the IJ and the BIA both disclaimed reliance on the new credibility standard limned in the REAL ID Act.

The petitioner nonetheless asserts that this disclaimer comprised nothing more than empty words and that the agency relied sub silentio on the REAL ID Act's credibility standard. In his view, this reliance can be inferred from the way in which the agency used lies concerning subsidiary matters as a basis for

finding a lack of veracity. That approach, he says, is consistent with the REAL ID Act but not with the "heart of the matter" rule.

This is magical thinking. Under the "heart of the matter" rule, an adverse credibility determination can be based on a wide range of discrepancies or inconsistencies as long as those discrepancies or inconsistencies go to the heart of the alien's claim. See Qin v. Ashcroft, 360 F.3d 302, 307-08 (1st Cir. 2004) (explaining that false testimony concerning matters central to an asylum claim may call into question a petitioner's overall credibility). Moreover, it is well accepted that discrepancies and inconsistencies go to the heart of the matter whenever they "pertain to facts central to the merits of the alien's claims, not merely to peripheral or trivial matters." Zheng v. Gonzales, 464 F.3d 60, 63 (1st Cir. 2006).

Those are exactly the types of discrepancies and inconsistencies that the IJ noted here. For example, the IJ found that the petitioner's pseudonymous Canadian asylum application cast his true identity into doubt — and there can be no question but that an alien's identity lies at the heart of an asylum claim. See 8 U.S.C. § 1158(d)(5)(A)(i); Khan v. Mukasey, 541 F.3d 55, 58 (1st Cir. 2008). Other discrepancies noted by the IJ related to the presence or absence of persecution and the existence or nonexistence of protected grounds — subjects that likewise go to the heart of the petitioner's asylum claim. We therefore reject as

unfounded the petitioner's plaint that the agency reached its adverse credibility determination through the use of an incorrect legal standard. In identifying which credibility standard pertained, the IJ and the BIA said what they meant and meant what they said.

The petitioner rejoins that even if the agency applied the correct credibility standard, the adverse credibility determination cannot stand. As we explain below, this asseveration is hopeless.

Judicial review of an adverse credibility determination in an immigration case brings to bear the familiar substantial evidence rubric. See Dhima v. Gonzales, 416 F.3d 92, 95 (1st Cir. 2005). Under that rubric, a court must uphold the agency's decision as long as it is "supported by reasonable, substantial, and probative evidence." Khan, 541 F.3d at 57 (internal quotation marks omitted). Consequently, a challenged decision must stand unless, viewing the record as a whole, "any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B); see Khan, 541 F.3d at 57. Tailoring this rubric to fit the contours of adverse credibility determinations, a reviewing court should leave such a determination intact as long as the agency provides specific and cogent reasons for it. See Syed v. Ashcroft, 389 F.3d 248, 252 (1st Cir. 2004).

Here, the adverse credibility determination is amply supported.  A few examples suffice to illustrate this point.

- The petitioner's Canadian asylum application used a fake name, articulated an inconsistent account of past persecution, and claimed imprisonment by the USC during a period of time in which the petitioner was actually living in Massachusetts.

- The petitioner apocryphally claimed that he had spent three years living in a Kenyan refugee camp.

- In a 1990 filing, the petitioner asserted that his first cousin was a leader of the SSDF and that his father was involved with the same group. These supposed connections mysteriously vanished in the four affidavits that he filed between 2005 and 2011.

- In contradictory affidavits and conflicting oral testimony, the petitioner gave vacillating accounts of the length of his supposed imprisonment by the Siad Barre regime.

Despite this imposing array of untruths, half-truths, and omissions, the petitioner demurs.  He employs empirical studies in an effort to explain away the manifold contradictions and inconsistencies that populate the record.  But abstract empiricism

is not the measure of judicial review. The agency need only articulate specific and cogent reasons in support of an adverse credibility determination. See id. The agency did so here.

Relatedly, the petitioner argues that the IJ and the BIA erred in faulting him for the absence of corroborating evidence. But the challenged statements must be taken in context. An adverse credibility determination, in and of itself, does not necessarily defeat an asylum application. See Vallejo Piedrahita v. Mukasey, 524 F.3d 142, 145 (1st Cir. 2008). Such a determination dooms the application, however, if the alien's case for asylum rests exclusively on his testimony. See id.; see also Olujoke v. Gonzales, 411 F.3d 16, 22 (1st Cir. 2005) (explaining that when an asylum-seeker's case relies on the truthfulness of his testimony without corroborative evidence, a fully supported adverse credibility determination warrants denial of asylum). The converse of this proposition is that the presence of corroboration may save an asylum application notwithstanding the alien's apparent lack of credibility. See Diab v. Ashcroft, 397 F.3d 35, 40 (1st Cir. 2005).

With this in mind, it is evident that the IJ and the BIA acted appropriately in noting the absence of corroboration here. This gap in the record was part and parcel of their explanation as

to why the petitioner's flawed credibility was fatal to his asylum application.[1]

The petitioner makes one final point with respect to asylum, claiming that — given the present situation in Somalia — he is entitled to asylum based on a well-founded fear of future persecution. This claim is premised on the petitioner's assertion that he is a Sufi Muslim and faces religious persecution at the hands of al-Shabaab. Both the IJ and the BIA found this assertion to be dependent upon the petitioner's incredible testimony and, thus, inadequately supported. We discern no error and, thus, uphold the denial of asylum.[2]

We turn next to the petitioner's challenge to the denial of his motion to amend. According to the petitioner, the IJ should have allowed him to rescind his concession that, when removal proceedings were commenced, he was present in the United States

---

[1] The petitioner suggests that if his own testimony was insufficient, the IJ should have requested corroborative testimony. But the burden of proof rested with the petitioner, see Vallejo Piedrahita, 524 F.3d at 144, and the IJ is not bound to alert the petitioner, mid-trial, to his failure to carry that burden, see Zeru v. Gonzales, 503 F.3d 59, 74 n.6 (1st Cir. 2007).

[2] In this court, the petitioner has not advanced any developed argumentation anent his claims for withholding of removal and CAT protection. These claims are, therefore, waived. See Ahmed v. Holder, 611 F.3d 90, 98 (1st Cir. 2010); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). In all events, the claims are premised on the same testimony that the IJ and the BIA supportably found to be unworthy of credence. Thus, the claims would fail even if they had been preserved. See Uruci v. Holder, 558 F.3d 14, 18 (1st Cir. 2009); Khan, 541 F.3d at 58.

without having been admitted or paroled after inspection. Rescinding that concession would have cleared the way for him to file for an adjustment in status — an adjustment that he now wishes to pursue. See 8 U.S.C. § 1255(a).

Both sides agree that our review of the denial of the leave to amend is for abuse of discretion. In 2007, the petitioner sought leave to amend his 2003 pleadings in which he had made the admission concerning his status. The IJ denied that request, concluding that the petitioner had failed to show good cause why amendment of the pleadings should be allowed after four years. The BIA affirmed.

The petitioner makes much of the fact that his status concession was made through his former counsel. As a general rule, parties are bound by the tactical decisions of their lawyers. See Lima v. Holder, ___ F.3d ___, ___ (1st Cir. 2014) [No. 13-1583, slip op. at 12-13]; Leblanc v. INS, 715 F.2d 685, 694 (1st Cir. 1983). If counsel concedes a point on his client's behalf, the client is bound by the concession unless he can demonstrate that his lawyer's conduct in making the concession was particularly egregious. See Lima, ___ F.3d at ___ [slip op. at 13]; Leblanc, 715 F.2d at 694.

In an effort to carry this weighty burden, the petitioner first suggests that his concession should be excused because until 2010 the law was unclear as to the meaning of the term "admitted."

See Matter of Quilantan, 25 I. & N. Dec. 285, 293 (B.I.A. 2010). But this suggestion is a non sequitur: the petitioner made the concession through counsel in 2003, and sought to retract it in 2007. The law was unchanged during that period, and it is self-evident that any light that Quilantan may have shed did not serve as the impetus for the petitioner's motion to amend. And even if the IJ had had the benefit of Quilantan's clarification of Matter of Arequillin, 17 I. & N. Dec. 308 (B.I.A. 1980), it would not have availed the petitioner.

The petitioner's fallback position is equally unavailing. He vaguely contends that the record confirms that he was inspected when entering the United States upon his return from Canada and that, therefore, it was inequitable to deny him leave to amend. But the petitioner reads the record through rose-colored glasses. As the BIA supportably found, the 1997 Border Patrol memorandum upon which the petitioner principally relies simply does not address whether he was inspected and admitted when he returned from Canada.

The short of it is that the petitioner has wholly failed to identify either any extenuating circumstances or any good cause for his four-year delay in seeking to amend his pleadings. It follows inexorably that the IJ did not abuse his discretion in denying leave to amend.

The petitioner's final claim of error posits that the BIA blundered in evaluating the fairness of the hearing that he received. To put this claim in perspective, some further background is essential.

In April of 2012, the petitioner and his lawyer were reviewing the case file at the immigration court. They discovered a note from the IJ to his law clerk, written after the close of all the evidence but while the case was pending final argument, which requested a draft opinion denying the petitioner's claims based on lack of credibility. The petitioner maintains that this note, at a minimum, creates an appearance of judicial bias sufficient to work a violation of due process.

We review the BIA's denial of this claim de novo. See Laurent v. Ashcroft, 359 F.3d 59, 62 (1st Cir. 2004). In our judgment, the BIA did not err in rejecting it.

When asserting a claim of judicial bias, an alien has the "substantial burden" of proving that the IJ showed a "deep-seated favoritism or antagonism that would make fair judgment impossible." Yosd v. Mukasey, 514 F.3d 74, 78 (1st Cir. 2008) (internal quotation marks omitted); see Liteky v. United States, 510 U.S. 540, 555 (1994). The petitioner has not even addressed this stringent standard, let alone satisfied it.

We need go no further. For the reasons elucidated above, the petition for judicial review is denied.

-13-