# United States Court of Appeals
## For the First Circuit

No. 19-1165

JOSE ERNESTO MENJIVAR BONILLA,

Petitioner,

v.

MERRICK B. GARLAND,<sup>*</sup>
UNITED STATES ATTORNEY GENERAL,

Respondent.

PETITION FOR REVIEW OF AN ORDER OF
THE BOARD OF IMMIGRATION APPEALS

Before

Kayatta and Barron, Circuit Judges,
Talwani,<sup>**</sup> District Judge.

Rachel L. Rado, for petitioner.
Jessica A. Dawgert, Senior Litigation Counsel, Office of
Immigration Litigation, Civil Division, with whom Joseph H. Hunt,
Assistant Attorney General, Civil Division, and Melissa Neiman-
Kelting, Assistant Director, Office of Immigration Litigation,
Civil Division, were on brief, for respondent.

January 12, 2022

---

* Pursuant to Fed. R. App. P. 43(c)(2), Attorney General
Merrick B. Garland has been substituted for former Attorney General
William P. Barr as the respondent.

** Of the District of Massachusetts, sitting by designation.

**TALWANI**, **District Judge**.  Jose Ernesto Menjivar Bonilla, a native and citizen of El Salvador, petitions for review of an order of the Board of Immigration Appeals ("BIA") affirming the denial of his application for withholding of removal under Immigration and Nationality Act ("INA") Section 241(b)(3) and relief under Article 3 of the United Nations Convention Against Torture ("CAT"). We grant the petition in part and remand for further proceedings.

## I. Background

On August 24, 2012, a border patrol agent from the Department of Homeland Security ("DHS") apprehended Bonilla near the Mexican border.  The border patrol agent prepared, and Bonilla signed, a "Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act"[1] ("2012 Record") stating that Bonilla did not fear being returned to his home country or country of last residence and would not be harmed if he was returned.  Bonilla was then removed by DHS under an expedited removal order.

Bonilla returned to the United States.  In 2018, DHS detained him and sought to reinstate the prior removal order.[2]  However, an asylum officer interviewed Bonilla and found that he had a

---

[1] Section 235(b)(1) of the INA, 8 U.S.C. § 1225(b)(1), governs inspection and expedited removals of inadmissible noncitizens who have not been admitted or paroled into the United States.

[2] Noncitizens who unlawfully reenter the United States are subject to reinstatement of their prior orders of removal.  8 U.S.C. § 1231(a)(5).

reasonable fear of persecution or torture upon his return to El Salvador. Bonilla, now represented by counsel, filed an application for withholding of removal and relief under the CAT, and his case was referred to an Immigration Judge ("IJ") for withholding-only proceedings.

During the proceedings before the IJ, Bonilla testified that, while in El Salvador, he belonged to a conservative political party, the Nationalist Republican Alliance ("ARENA"), which had been in power for more than twenty years. He stated that, before 2009, he had a business selling clothing and food, and he also operated a taxi business. He received political support from ARENA, including the permits necessary to run the taxi business. Bonilla also testified that he became actively involved in ARENA's political activities, such as organizing voter drives and political marches.

In 2009, ARENA's political opponent, the Farabundo Martí National Liberation Front ("FMLN") won the presidency in El Salvador. Bonilla testified that, thereafter, individuals associated with FMLN replaced the local officials with whom he had been familiar and began to harass him. He stated that FMLN officials arbitrarily issued him tickets -- sometimes as many as five a day -- and threatened to take away his taxi business. Ultimately, in 2011, the FMLN government refused to renew his license to operate the business.

Bonilla also testified that, beginning in 2010 or 2011, his seven-year-old son experienced constant fevers and headaches. Bonilla stated that individuals associated with the local hospitals denied his son medical care because of Bonilla's association with ARENA. Bonilla testified that he did not report these incidents to the police because he believed the police had authorized the discrimination against him and his family.

Bonilla testified that in January 2012, police officers arrived at his home in the middle of the night and asked him if one of his cabs had been involved in an accident. Bonilla stated that when he went to look at the cab, he discovered that the police officers had covered it in blood. The officers then told him that he would have to start making "special trips" for them. Bonilla testified that a few months later, in June 2012, four police officers approached him and ordered him to transport weapons for them. Bonilla refused, and the officers told him that he was endangering his family members' lives.

Bonilla testified further that in July 2012, while he was waiting for a customer at a bus stop, someone came out of a car and pointed a gun at his head. The gun failed to fire, and the assailant hit Bonilla on the left side of his head with a machete. Bonilla left town to seek medical attention at a private clinic because he was worried that he would not be treated properly if he went to the local public hospital. Bonilla received ten stitches

on the left side of his head and three stiches on his lip. Bonilla testified that he still has a scar above his left ear, and he showed it to the IJ. Bonilla testified that he did not report the assault for fear of reprisal and that he never learned the identity of the assailant. He stated that it was after this incident, in August 2012, that he first fled to the United States.

Finally, Bonilla testified that when he was interviewed by the border patrol agent in 2012, he was not asked about whether he had any fear of returning to El Salvador. In addition to his testimony, Bonilla introduced several pieces of documentary evidence in support of his claims for humanitarian relief.

As recounted in the IJ's decision denying the petition, the IJ "d[id] not enter an explicit adverse credibility finding," but "ha[d] serious doubt with respect to [Bonilla's] credibility" and found that "these credibility issues . . . affect[ed] [Bonilla's] ability to establish his burden of proof[.]" The IJ noted "several instances in [Bonilla's] testimony when compared to the documents of record, as well as to other statements made, that give the court serious pause as to the credibility of his statements." The IJ found that Bonilla's testimony "[wa]s significantly undercut with his lack of a claim of fear of harm or torture should he return to El Salvador when he was first encountered in 2012." Based on these issues, the IJ concluded that Bonilla's testimony was entitled to "limited weight" and corroboration was required.

The IJ found further that Bonilla had not produced corroborating evidence; that this failure to provide corroborating evidence was "fatal to his claim for relief"; and that Bonilla had not shown that he was likely to suffer future persecution on account of his membership with ARENA. Accordingly, the IJ denied Bonilla's applications for withholding of removal and relief under the CAT.

The BIA summarily affirmed the IJ's decision without opinion. This petition for judicial review followed.

## II. Standard of Review

"Ordinarily, Courts of Appeals review decisions of the [BIA], and not those of an IJ. When the BIA does not render its own opinion, however, and either defers [to] or adopts the opinion of the IJ, a Court of Appeals must then review the decision of the IJ," Albathani v. INS, 318 F.3d 365, 373 (1st Cir. 2003) (alterations in original) (quoting Gao v. Ashcroft, 299 F.3d 266, 271 (3d Cir. 2002)), "as if it were the decision of the BIA," Aguilar v. Gonzales, 475 F.3d 415, 417 (1st Cir. 2007).

Claims of legal error are reviewed "de novo, 'subject to appropriate principles of administrative deference.'" Ordonez-Quino v. Holder, 760 F.3d 80, 87 (1st Cir. 2014) (quoting Larios v. Holder, 608 F.3d 105, 107 (1st Cir. 2010)).

Judicial review of the agency's factual determinations in removal proceedings is "highly deferential." Nasrallah v. Barr,

140 S. Ct. 1683, 1692 (2020) (applying the standard in context of CAT proceedings). "The agency's 'findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary.'" Id. (quoting 8 U.S.C. § 1252(b)(4)(B)). An agency may not "'arbitrarily' reject an alien's evidence." Garland v. Ming Dai, 141 S. Ct. 1669, 1677 (2021) (quoting Dir., Off. of Workers' Comp. Programs v. Greenwich Collieries, 512 U.S. 267, 279 (1994)). But the agency, "like any reasonable factfinder," is free to accept "all, none, or some of the alien's testimony; its reasonable findings may not be disturbed." Id.

### III. Discussion

### A. Withholding of Removal Under INA Section 241(b)(3) and CAT

A noncitizen is entitled to withholding of removal under INA Section 241(b)(3) if his "life or freedom would be threatened in [the designated country of removal] . . . because of [his] race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). The noncitizen may meet this burden by showing either that he suffered past persecution, which gives rise to a rebuttable presumption of future persecution, or that a clear probability of future persecution independently exists should the applicant be removed to the designated country. Arevalo-Giron v. Holder, 667 F.3d 79, 82 (1st Cir. 2012). CAT relief, on the other hand, requires a noncitizen establish "that it is more likely than not that he or she would be

- 6 -

tortured if removed to the proposed country of removal." 8 C.F.R. § 1208.16(c)(2).

Under the REAL ID Act, an applicant's testimony alone "may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee." 8 U.S.C. § 1158(b)(1)(B)(ii). In conducting this inquiry, "the trier of fact may weigh the credible testimony along with other evidence of record." Id.

The statute also addresses an IJ's authority and responsibility to evaluate an applicant's credibility:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements, without regard to whether an inconsistency, inaccuracy, or falsehood goes to the heart of the applicant's claim, or any other relevant factor.

Id. § 1158(b)(1)(B)(iii).

## B. The 2012 Record

In assessing Bonilla's credibility, the IJ pointed to discrepancies between Bonilla's hearing testimony and the 2012

- 7 -

Record. The IJ noted that the 2012 Record "indicate[d] [that Bonilla] was specifically questioned" about having any concerns about returning to his home country, to which Bonilla reportedly answered "that "he had no fear of return, that he came to the United States to work," and that Bonilla "sign[ed] a statement to that effect." Relying on this court's decision in <u>Muñoz-Monsalve</u> v. <u>Mukasey</u>, 551 F.3d 1, 8 (1st Cir. 2008), the IJ noted that "under circumstances where the respondent 'has told different tales at different times,'. . . an immigration judge is entitled to 'sharply discount a petitioner's testimony.'" The IJ concluded that "in the absence of clear evidence that the [immigration] officials improperly discharge[d] their duties," Bonilla's testimony was "significantly undercut" by his "lack of a claim of fear or torture should he return to El Salvador when he was first encountered in 2012."

In his petition for review, Bonilla asserts that the IJ's reliance on the 2012 Record was improper.[3] "Strict rules of

---

[3] The government argues that Bonilla's due process claim must be dismissed because he did not argue before the BIA that the IJ's actions violated his due process rights. A court of appeals may review a final order of the BIA "only if . . . the alien has exhausted all administrative remedies available to the alien as of right." 8 U.S.C. § 1252(d)(1). This also requires issue exhaustion before the BIA. See <u>Sanabria Morales</u> v. <u>Barr</u>, 967 F.3d 15, 19 (1st Cir. 2020) ("[W]e may not entertain arguments not made to the BIA, which 'fail[] for lack of exhaustion'") (second alteration in original) (quoting <u>Molina De Massenet</u> v. <u>Gonzales</u>, 485 F.3d 661, 664 (1st Cir. 2007))). Although now framed as a due process challenge, Bonilla's claim regarding the IJ's

- 8 -

evidence do not apply to immigration proceedings" and "[i]t is normally enough if the IJ reasonably finds a proffered piece of evidence to be reliable and its use to be fundamentally fair." Jianli Chen v. Holder, 703 F.3d 17, 23 (1st Cir. 2012). Even under this deferential standard, however, the IJ erred in finding "sufficient indicia that the [2012 Record] is reliable."

In Jianli Chen, the IJ's finding that the form in question was "sufficiently reliable on [its] face was supported by the record." Id. That is not the case here.

The 2012 Record is identified as the signed statement by "Ernesto Bonilla-Mentivar AKA: Menjivar, Jose Victor," with the pages initialed "EMB." But the questions and answers reported in the document do not match that name. Instead, the following is reported:

    Q: What is your true and correct name?
    A: Jose Ramos Ibarra.
    Q: Have you ever used any other name?
    A: No.

According to the 2012 Record, the interviewee also reported a different birthdate then that sworn to by Bonilla at the hearing (May 29 instead of March 29) and a different date of entry (March 2012 instead of August 2012).

The IJ rejected these concerns. The IJ noted that Bonilla

---

consideration of the 2012 Record is fundamentally a challenge to the IJ's evidentiary rulings, which he raised below.

- 9 -

"testified initially on cross-examination when asked who Jose Ramos-Ibarra . . . was that this was a coworker that was doing the same type of work as the respondent," and from this inferred that Bonilla "used this alias in August of 2012."[4]  The IJ stated further that Bonilla later "backtracked in his testimony indicating that he did not understand the question," but that Bonilla "otherwise admitted to signing the statement."

But, Bonilla's 2018 testimony does not provide substantial evidence that the 2012 Record was reliable, given that the 2012 Record reports simultaneously that the person who signed it "Bonilla" and initialed it "EMB" states that his true name is Jose Ramos Ibarra and that he had never gone by any other name.

In addition, the 2012 Record also included another seeming irregularity, which the IJ failed to address. The 2012 Record reports that Bonilla stated that his most recent entry was in March 2012, and that he entered "by "walking through the desert near

---

[4] The testimony does not support the latter statement. Bonilla was asked about his use of the alias in the following exchanges:

Q. "Well, sir, didn't you previously use that alias when you entered the United States on August 2012?"

A. "No."

Q. "Well, sir, the name that you provided to them when they asked you your identity was Jose Ramos Ibarra. Do you remember using that alias?"

A. "I had never heard the name."

Sasabe, Arizona." But, the 2012 Record itself is dated many months later, in August 2012, with no explanation for the substantial gap in time between the reported entry and the interview documented by the 2012 Record.[5] The IJ made no finding about this seeming inconsistency when assessing whether the 2012 Record was reliable.

Further compounding the concern that the 2012 Record is not reliable is the discrepancy between what Bonilla testified in 2018 is his birthdate and the reported birthdate in the 2012 Record. The IJ found no issue with the birthdate, asserting that Bonilla confirmed at the 2018 hearing that it was "correctly indicated" as May 29, despite the transcript showing Bonilla repeatedly testifying that his birthdate was March 29, not May 29.

Bonilla did admit that he was placed under oath and that he signed the document. The paragraph above his signature line states that he read the statement or had it read to him. The border patrol agent also attested on the document that Bonilla signed the document. Unlike in Jianli Chen, however, where the form was "compiled with the aid of a telephonic interpreter," 703 F.3d at 23, here no telephonic interpreter was used, and instead, the border patrol agent himself conducted the interview in Spanish.

---

[5] In 2012, noncitizens who had been physically present in the U.S. for a continuous period of more than fourteen days immediately prior to the date of the encounter with DHS were not eligible for expedited removal. See Designating Aliens for Expedited Removal, 69 Fed. Reg. 48,877 (Aug. 11, 2004).

Moreover, there is no affirmation, by either Bonilla or the border patrol agent, that the answers set forth in English in the 2012 Record were read back to Bonilla in Spanish before he initialed and signed the document.

In light of the unexplained irregularities in the 2012 Record -- including signing off both to another name and to the statement that no other name has been used), the entry date, and the birthdate -- we cannot uphold the IJ's determination that the 2012 Record is supported by sufficient indicia of reliability to be used in assessing Bonilla's credibility.

### C. Remand

From this finding it does not necessarily follow that Bonilla is entitled to relief. First, even without the 2012 Record, the factfinder may still conclude on the remaining record that Bonilla's testimony lacked credibility and should be given limited weight. Moreover, IJs can require corroboration without making an adverse credibility determination. Balachandran v. Holder, 566 F.3d 269, 273 (1st. Cir. 2009) (citing 8 U.S.C. § 1158(b)(1)(B)(ii)). And even assuming that Bonilla's testimony was credible, the IJ must still find, based on the evidence, that Bonilla "suffered past persecution" or that "a clear probability of future persecution" exists because of his political affiliation. Arevalo-Giron, 667 F.3d at 82.

Nonetheless, because the IJ's assessments of Bonilla's

- 12 -

credibility and the decision to require corroborating evidence were based in significant part on discrepancies with the 2012 Record, which we have determined to be unreliable, further factfinding is required. See Mboowa v. Lynch, 795 F.3d, 222, 229 (1st Cir. 2015) (finding remand warranted where a central aspect of the agency's credibility assessment is flawed). Accordingly, we remand to the agency for further factfinding. Guta-Tolossa v. Holder, 674 F.3d 57, 61 (1st Cir. 2011) ("Where a question is best resolved by the agency in the first instance, or is left primarily in the agency's hands by statute, and the agency has failed to address that question, we generally must remand."); see also Kho v. Keisler, 505 F.3d 50, 56 (1st Cir. 2007) ("If, in the absence of a credibility finding by the IJ, a reviewing court determines that such a finding is necessary for effective review of the case, it may remand to the agency for further factfinding."). Accordingly, we **vacate** the denials of withholding and relief under the CAT and **remand** for further consideration consistent with this opinion.