# United States Court of Appeals
## For the First Circuit

No. 22-1397

FNU JANI,

Petitioner,

v.

MERRICK B. GARLAND, Attorney General,

Respondent.

PETITION FOR REVIEW OF AN ORDER
OF THE BOARD OF IMMIGRATION APPEALS

Before

Barron, <u>Chief Judge</u>,
Lipez and Kayatta, <u>Circuit Judges</u>.

<u>Michael B. Kaplan</u>, with whom <u>Jeffrey B. Rubin</u>, <u>Todd C. Pomerleau</u>, and <u>Rubin Pomerleau PC</u> were on brief, for petitioner.

<u>Drew C. Brinkman</u>, Senior Counsel for National Security, Office of Immigration Litigation, with whom <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, Civil Division, and <u>Lindsay M. Murphy</u>, Deputy Chief, National Security Unit, Office of Immigration Litigation, were on brief, for respondent.

July 29, 2024

**KAYATTA**, <u>Circuit Judge</u>. Indonesian national Jani (first name unknown) petitions for review of a Board of Immigration Appeals ("BIA") decision affirming an Immigration Judge's ("IJ") order finding Jani ineligible for asylum because he once provided material support to a foreign terrorist organization. Jani argues that the agency violated both his constitutional due process rights and its own regulations in so ruling. For the following reasons, we find each of Jani's arguments to be unavailing. Accordingly, we must deny the petition.

## I.

We first describe the relevant statutory background, and then recount, in two acts, the serpentine travel of a case that has taken nearly twenty years to call for a decision by this court.

## A.

The Immigration and Nationality Act ("INA") provides that any noncitizen who has "engaged in a terrorist activity" is ineligible for asylum. <u>See</u> 8 U.S.C. §§ 1158(b)(2)(A)(v), 1182(a)(3)(B)(i)(I). The statute defines "terrorist activity" broadly to include "commit[ting] an act that the actor knows, or reasonably should know, affords material support" to a terrorist organization. <u>Id.</u> § 1182(a)(3)(B)(iv)(VI)(dd). "Material support" includes, among other things, "communications." <u>Id.</u>

The INA defines three types of "terrorist organizations." The Secretary of State designates "Tier I" and

"Tier II" terrorist organizations, while "Tier III" (or "undesignated") terrorist organizations may be designated by IJs or the BIA on a case-by-case basis in removal proceedings. See 8 U.S.C. § 1182(a)(3)(B)(vi); Khan v. Holder, 766 F.3d 689, 691 n.1 (7th Cir. 2014). If noncitizens provided material support to a Tier I or II organization, they are barred from entry into the United States regardless of their knowledge about the organization's status. 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(cc); see also Khan, 766 F.3d at 691. If the organization is undesignated, the noncitizen may attempt to "demonstrate by clear and convincing evidence that [he] did not know, and should not reasonably have known, that the organization was a terrorist organization." 8 U.S.C. § 1182(a)(3)(B)(iv)(VI)(dd). Otherwise, the noncitizen is ineligible for asylum under the terrorism bar.

More broadly, if the evidence indicates that the terrorism bar -- a ground for "mandatory denial" of asylum -- may apply, the noncitizen "shall have the burden of proving by a preponderance of the evidence that [it does] not apply." 8 C.F.R. § 1240.8(d). Meanwhile, noncitizens charged with removability already have the burden to prove their eligibility for the requested relief or protection from removal, including asylum. Id.; 8 U.S.C. § 1229a(c)(4)(A).

**B.**

Jani is a native and citizen of Indonesia who entered the United States on a ten-day non-immigrant visa in April 2001. In 2003, the Department of Homeland Security ("DHS") commenced removal proceedings against Jani, charging him with removability under 8 U.S.C. § 1227(a)(1)(B) for overstaying his visa. Jani appeared before an IJ and conceded his removability as charged, but applied for asylum and withholding of removal.

As Jani stated on his application, he is an ethnically Chinese Indonesian. According to Jani, ethnic Chinese Indonesians are a predominantly Christian minority in Indonesia who have been persecuted by the country's predominantly Muslim majority. Jani further stated that in February 2001, a group of native Indonesian "extremist[s]" -- whom he did not know were "anti-Chinese and anti-Christian" -- recruited Jani into their group. He stated that he was "informed that they could help [him] earn more substantial income by the means of demonstration and terrorism," and that they "succeeded in convincing [Jani]" to join. So, he "then enrolled as an active member," and was "sworn in the presence of the leadership of the group." But after he "observed their practices and could see the planning program of destruction," including their "scheming to grab substantial amount[s] of money by threat of terror," he realized he "made a fatal mistake." As a result, Jani fled, risking his life in the process -- the group

threatened to kill him and burned his family store.  He eventually made his way to the United States.

After Jani applied for asylum, he married Imelda Sumago ("Sumago") -- an Indonesian citizen who was also in removal proceedings in the United States, and who had likewise applied for asylum.  Jani and Sumago's proceedings were subsequently consolidated before the same IJ.

On August 15, 2006, the IJ held a hearing on Jani and Sumago's asylum claims.  After Sumago's testimony, Jani asked the IJ to grant him asylum as a derivative beneficiary of Sumago's application.  The IJ stated its inclination to grant the couple asylum on the basis of Sumago's principal claim, and noted that it would not need to hear the merits of Jani's originally filed claim due to his derivative status.  However, the IJ permitted counsel for DHS to cross-examine Jani about his involvement with the terrorist group mentioned in his application.

The transcript of the ensuing colloquy between DHS counsel and Jani contains dozens of "indiscernible" notations, many of them at key moments of Jani's testimony.  Some examples include:

>     [DHS Counsel] TO MR. FNU JANI
>     Q.   [indiscernible].
>     A.   Yes.
>     Q.   What does that group?
>     A.   It's a group -- a Muslim group called
>          Jemaah Islamiya.
>     Q.   Islamiya Jemaah?

A.   Islamiya Jemaah.
     . . .
Q.   And they offered you money to join and
     what were you going to do for them?
A.   They promised me money, my job is as a
     liaison to stores belonged to the
     Chinese.
Q.   [indiscernible].
A.   Yes.
Q.   And [indiscernible] this group, did they
     kidnapped and killed [indiscernible].
A.   They stole their belongings and their
     houses, and burned their houses if they
     don't give the money.
     . . .
[Q.] [indiscernible] did you actually go with
     them to identify which Chinese and
     Christians were to be targeted?
[A.] Yes.

At the conclusion of the hearing, the IJ granted Sumago's asylum application and granted Jani derivative asylee status. DHS reserved its right to appeal Jani's claim to the BIA, but waived appeal as to Sumago.

On September 12, 2006, DHS then filed a notice of appeal with the BIA, arguing that Jani was ineligible for asylum under the INA because he conceded membership in Jemaah Islamiyah, an extremist organization intent on establishing an Islamic caliphate across southeast Asia. DHS noted that the Secretary of State designated Jemaah Islamiyah as a foreign terrorist organization in 2002 after it was deemed responsible for the bombing of a tourist nightclub in Bali that killed 202 people that same year.

Meanwhile, DHS filed a motion with the IJ to reopen Sumago's proceedings. DHS argued that it had mistakenly waived

its right to appeal her case, and that, because Sumago and Jani's cases had been consolidated, it was "appealing one case." After further proceedings, the IJ ultimately denied the motion on August 24, 2007, and DHS did not appeal.

On April 11, 2008, DHS filed a motion with the BIA to suspend briefing in its appeal of Jani's asylum claim and to issue a complete transcript. It noted that the version of the transcript then available contained numerous "indiscernible" notations and was therefore "unusable as evidence." The BIA granted DHS's motion, and remanded proceedings to the IJ with instructions to "take such steps as are necessary and appropriate to enable [the] preparation of a complete transcript of the proceedings including a new hearing, if necessary."

On September 15, 2008, the IJ held another hearing. On direct examination, Jani testified that he had been recruited by an organization in Indonesia called the "elite group," but that he was not a member and never did anything for the group. DHS then cross-examined Jani and, over the objections of Jani's counsel, impeached him with his prior testimony from the August 2006 hearing and his written application. In the course of his testimony, Jani admitted to joining Jemaah Islamiya in December 2000, and to going with the group at least once to identify Chinese Christians to be targeted for extortion.

At the conclusion of the hearing, the IJ found Jani ineligible for asylum based on his membership in Jemaah Islamiya, a designated foreign terrorist organization. The IJ therefore ordered Jani to be removed to Indonesia.

Jani appealed to the BIA shortly thereafter, and the BIA dismissed his appeal in June 2010. Jani then petitioned for review to this court, but while that appeal was pending, DHS again moved for the BIA to reopen Jani's removal proceedings. This time, DHS asked that the record be reopened "to correct the application of the material support bar" to Jani's asylum eligibility and "re-analyz[e] the bar with regard to an undesignated terrorist organization." The problem was that Jemaah Islamiya actually had not been a designated Tier I foreign terrorist organization at the time of Jani's alleged involvement (which pre-dated 2002). Yet the IJ and BIA had applied the statutory terrorism bar applicable to Tier I organizations. So, DHS asked the BIA to clarify that the terrorism bar also applied to undesignated (or Tier III) terrorist organizations, and to affirm on that alternative ground. See 8 U.S.C. § 1182(a)(3)(B)(vi) (defining "terrorist organization"). For his part, Jani agreed that proceedings should be reopened given the mischaracterization of the terrorist organization, yet he also asserted that DHS had not shown that the terrorism bar applied.

In March 2011, the BIA granted the motion to reopen. However, in its order, the BIA found that "[g]iven the gravity" of the terrorism bar at issue and "the incomplete nature of the record," it was necessary to remand the matter "for a de novo hearing to allow for a complete inquiry with regard to all issues presented by these proceedings."

## C.

On remand, the IJ held a hearing (Jani's third) over the course of three days between November 2012 and January 2013. During the hearing, the IJ rejected what it characterized as Jani's estoppel-like argument against DHS's use of the transcripts from the earlier 2006 and 2008 hearings to cross-examine Jani. The IJ found it permissible for DHS to impeach Jani with reference to transcribed portions of the 2006 hearing, even if other portions were indiscernible. And the IJ noted that the ultimate issue of what was or was not in the record from those prior hearings was for the IJ to "sort out at the end." Jani then again admitted, despite some contradictory testimony, that a "Muslim extremist" recruited him to join an "elite group," and that he told a member of the group about a rich Chinese businessman for it to target. But he also insisted that he had "just mentioned that [one] person" out of fear.

Five years passed. In July 2018, the IJ denied Jani's request for asylum and ordered him removed to Indonesia.[1] The IJ concluded that Jani was ineligible for asylum because there was evidence that Jani provided material support to a then-undesignated foreign terrorist organization, Jemaah Islamiya, and that Jani failed to prove by a preponderance of the evidence that the terrorism bar was inapplicable.

More specifically, the IJ found -- "based on the entirety of the testimonial evidence in the record" -- that Jani was a member of Jemaah Islamiya. The IJ noted that "[a]lthough the transcript of the 2006 hearing is replete with indiscernibles [sic.], it is apparent that [Jani] first identified the group as Jemaah Islamiya without any prompting by DHS," and that he again acknowledged his membership during the 2008 hearing. The IJ rejected Jani's request to exclude the entire 2006 hearing transcript, finding that it would consider the transcript but "accord[] it reduced weight to account for the indiscernible portions and the lack of context surrounding some of the properly recorded sections."

---

[1] The IJ also found that Jani was not eligible to apply for derivative withholding of removal under the INA or the Convention Against Torture ("CAT"), because Sumago was not granted that relief and because there are no derivative benefits for family members of those granted withholding of removal. See Cendrawasih v. Holder, 571 F.3d 128, 131 (1st Cir. 2009). Jani did not dispute this finding in his appeal to the BIA, nor does he raise it now, so we consider it waived.

While the IJ declined to find Jani not credible, it found that "[o]nly after his asylum application was denied due to the terrorism bar did [Jani] attempt to distance himself from any affiliation with Jemaah Islamiya," and that the IJ found Jani's "self-serving recantation" at the 2012-13 hearings unpersuasive. Rather, the IJ found that Jani admitted that he swore allegiance to Jemaah Islamiya, and that he was recruited to identify and coerce "donations" from Chinese businessmen by use of threats. And it found that, by admitting to identifying at least one such possible target, Jani provided Jemaah Islamiya with material support in the form of "communications" to facilitate extortion. Moreover, the IJ found Jani's testimony that he only identified the businessman out of fear insufficient to prove by clear and convincing evidence that he did not know (or should not have known) that Jemaah Islamiya was a terrorist organization. Consequently, the IJ concluded that Jani failed to show by a preponderance of the evidence that the terrorism bar did not apply.

Jani then appealed to the BIA. As relevant here, he argued, first, that the IJ's findings did not warrant application of the terrorism bar because he did not provide material support to Jemaah Islamiya. To that end, Jani referenced his due process rights (albeit only in his recitation of facts) and his unsuccessful attempts to preclude further use of the 2006 transcript in subsequent proceedings. Second, he made a procedural

argument. Specifically, he argued that he has held derivative asylum status since 2006, when the IJ granted his wife Sumago's principal claim and DHS waived its right to appeal her claim. As a result, he argued that the agency could only terminate its grant of asylum to Jani as a derivative asylee pursuant to 8 C.F.R. § 208.24(f).

On April 21, 2022, the BIA dismissed Jani's appeal. The BIA found that the record supported the IJ's determination that Jani provided material support to Jemaah Islamiya by identifying a Chinese businessman as a target for the group to extort. As relevant here, the BIA found that while the 2006 hearing transcript contained numerous "indiscernible" notations, the IJ made "reasonable inferences from direct and circumstantial evidence of the record as [a] whole" to reach its conclusions. Additionally, the BIA rejected Jani's procedural claim, finding that Jani's derivative asylee status never became administratively final because the government properly reserved its right to appeal, and subsequently did appeal, his derivative claim in 2006.[2]

Jani now petitions this court for review, asserting two principal claims of error. First, he argues that the IJ and BIA's reliance on the defective 2006 hearing transcript in subsequent

---

[2] The BIA also refused to consider Jani's claim for protection under CAT, see 8 C.F.R. §§ 1208.16(c), 1208.17–1208.18, because Jani expressly abandoned pursuit of that claim before the IJ. Jani likewise raises no such claim here, so we deem it waived.

proceedings violated his due process rights.  Second, he reasserts his procedural claim, arguing that the finality of the IJ's grant of asylum to Sumago meant DHS had to (and failed to) follow the procedures outlined at 8 C.F.R. § 208.24(f) to terminate Jani's ostensible derivative asylee status.

## II.

When the BIA adopts and affirms an IJ's decision while adding its own gloss, we review both decisions together. Varela-Chavarria v. Garland, 86 F.4th 443, 449 (1st Cir. 2023).

We "generally lack jurisdiction to review factual findings underlying a denial of asylum under a terrorism bar." Viegas v. Holder, 699 F.3d 798, 801 (4th Cir. 2012); see 8 U.S.C. § 1158(b)(2)(D).  In any event, Jani does not meaningfully attempt to dispute the agency's factual findings on appeal, apart from arguing in passing that he supported an "elite group," not Jemaah Islamiya.  So, even if we had jurisdiction to consider this argument, the record supports the agency's conclusion that Jani supported Jemaah Islamiya, as Jani himself testified in 2008.  We do, though, retain jurisdiction to review claims of legal error -- including the two Jani asserts here -- de novo.  See 8 U.S.C. § 1252(a)(2)(D).

## III.

### A.

We begin with Jani's constitutional due process claim, which comes in two shades. First, Jani argues that the IJ and BIA's reliance on the defective 2006 hearing transcript violated his due process right to a fundamentally fair hearing and prejudiced his ability to perfect an appeal before the BIA and this court. Second, and relatedly, he argues that the agency unlawfully denied him a fair opportunity to reconstruct the record after the transcription issue arose, including by letting DHS use the 2006 transcript as a tool to impeach him on cross-examination.

### 1.

As a threshold matter, the government parries that this court lacks jurisdiction over Jani's due process claim because our jurisdiction extends only to "colorable" constitutional claims and questions of law, see Elysee v. Gonzales, 437 F.3d 221, 223 (1st Cir. 2006), which Jani's claims are not. We reject this jurisdictional contention. We have generally held that a "[noncitizen] in an immigration proceeding . . . is entitled to a fair hearing," although "not necessarily a perfect one," and thus can succeed on a due process claim if the due process violation caused prejudice. Santosa v. Mukasey, 528 F.3d 88, 93-94 (1st Cir. 2008) (quoting Pulisir v. Mukasey, 524 F.3d 302, 311 (1st Cir. 2008)). Indeed, this court has recognized that "there is a

due process violation if [a removal proceeding] was so fundamentally unfair that the [noncitizen] was prevented from reasonably presenting his case." Jobe v. INS, 238 F.3d 96, 99 n.3 (1st Cir. 2001) (discussing an asylum claim); see also Marincas v. Lewis, 92 F.3d 195, 203 (3d Cir. 1996) (assuming that Congress intended the asylum procedure to accord with the basics of procedural due process). We have also held that "due process demands a 'reasonably accurate [and] reasonably complete transcript,' or an adequate substitute, to allow for meaningful and adequate appellate review" of IJ and BIA decisions. See Oroh v. Holder, 561 F.3d 62, 65 (1st Cir. 2009) (citation omitted). Consequently, we decline the government's invitation to find Jani's due process claim not even reviewable.

The government next argues that Jani's failure to administratively exhaust his due process arguments below precludes us from considering them now. As we have consistently held, "[i]ssues 'not raised before the BIA may not be raised for the first time on a petition for review.'" Varela-Chavarria, 86 F.4th at 449 (quoting Bernal-Vallejo v. INS, 195 F.3d 56, 64 (1st Cir. 1999)); see also 8 U.S.C. § 1252(d)(1). If, however, the BIA lacks "the power to address the matter as to which exhaustion is claimed," then no exhaustion is required. Bernal-Vallejo, 195 F.3d at 64. But while "'[t]he BIA is without jurisdiction to adjudicate purely constitutional issues,'" it can assess

procedural errors in IJ proceedings, "even if such errors are characterized as due process concerns." Varela-Chavarria, 86 F.4th at 449 (quoting Ravindran v. INS, 976 F.2d 754, 762-63 (1st Cir. 1992)).

In his appeal to the BIA, Jani made a few arguments -- albeit couched in his recitation of facts -- that one could read to fairly raise the transcript-related procedural issues he now more squarely invokes. First, he argued that the BIA's 2011 order for a "de novo hearing," given the "incomplete nature of the record" and the gravity of the terrorism bar at issue, "vacated" all prior IJ and BIA decisions. Second, Jani argued that he is "entitled to due process of law in these proceedings" before the IJ and BIA, emphasizing the recurring issues with regard to DHS and the IJ's use of the defective 2006 hearing transcript in subsequent proceedings. And in relevant part, he noted that the most recent 2018 IJ decision made use of the defective transcript even though DHS had told the BIA it was "unusable as evidence."

The BIA's decision addressed the gist of Jani's complaint about the use of the transcript. This suggests that Jani's brief on appeal was indeed sufficient to bring the argument to the attention of the BIA. And, in any event, even when a petitioner does not foursquare raise an issue, we deem it preserved if the BIA elects "to address in sufficient detail the merits of

a particular issue." Mazariegos-Paiz v. Holder, 734 F.3d 57, 63 (1st Cir. 2013). We therefore find Jani's challenges related to the defective transcript -- now framed in the language of due process -- properly before us.

**2.**

On the merits, however, Jani's due process arguments surrounding the 2006 hearing transcript -- from DHS's use of the transcript during his hearings to the IJ and BIA's reliance on it as part of the record -- all fall short.

As a general matter, Jani was entitled "to a fair hearing, not necessarily a perfect one." Pulisir, 524 F.3d at 311. "Strict rules of evidence do not apply to immigration proceedings, and it is normally enough if the IJ reasonably finds a piece of evidence to be reliable and its use to be fundamentally fair." Bonilla v. Garland, 23 F.4th 61, 67 (1st Cir. 2022) (cleaned up and citation omitted). Even under the rules of evidence, opposing party statements are generally admissible, see Fed. R. Evid. 801(d)(2), as is extrinsic evidence of a witness's prior inconsistent statement, see Fed. R. Evid. 613(b). A witness may also be asked about a prior statement without being shown the statement itself. See Fed. R. Evid. 613(a), 801(d)(1)(A).

Here, the record does not show that the defective 2006 hearing transcript, despite its indiscernible portions, prejudiced Jani in subsequent proceedings. Given the IJ's broad authority to

consider relevant material from prior proceedings, see 8 C.F.R. § 1240.7(a), and that the parties were unbound from the rules of evidence, Jani is hard-pressed to show that the 2006 transcript was not fair game for impeachment purposes. There is certainly no categorical rule that incompletely recorded or remembered conversations cannot be used for any purpose. To the contrary, an IJ "may receive in evidence any oral or written statement that is material and relevant to any issue in the case previously made by the respondent or any other person during any investigation, examination, hearing, or trial." Id. Moreover, the IJ's conduct at both Jani's 2008 and 2012-13 hearings was more than aboveboard. The IJ affirmatively engaged in sustained colloquies with the parties regarding Jani's many objections to DHS's use of the transcript to impeach Jani, taking pains to ensure that DHS was accurately representing Jani's earlier testimony.

At bottom, the record shows only that Jani fell victim to effective cross-examination. At both hearings, Jani ultimately volunteered several self-defeating admissions. At the 2008 hearing, he admitted to joining Jemaah Islamiya in 2000, going to a remote area where the group stored weapons, and identifying one Chinese businessman for the group to extort. And at the 2012-13 hearing, he again admitted to telling the "elite group" about at least one rich Chinese businessman for it to extort. Neither DHS's

use of the transcript as part of those efforts, nor the IJ's treatment thereof, denied Jani a fair hearing.

In terms of the IJ and BIA's reliance on the transcript as part of its ultimate eligibility decision, Jani fails to demonstrate why it was improper for the IJ (and the BIA) to consider the entirety of the record. See 8 C.F.R. § 1240.7(a). That administrative record consists of "[t]he hearing before the [IJ], including the testimony, exhibits, applications, proffers, and requests, the [IJ's] decision, and all written orders, motions, appeals, briefs, and other papers filed in the proceedings." Id. § 1240.9. While the IJ has discretion to "exclude from the record any arguments made," id., Jani points to no relevant authority suggesting that the agency should have shut its eyes to plainly relevant material from past proceedings. Indeed, as the IJ noted at the 2012 hearing, the ultimate issue of what was (or was not) in the record was for him to "sort out at the end." And ultimately, in its 2018 decision, the IJ prudently noted that it accorded the 2006 transcript "reduced weight" to account for the indiscernible portions and lack of context surrounding certain parts of Jani's testimony. This was more than enough to ward off any due process concerns. Consequently, we find no fault in the agency's circumscribed use of the transcript as part of the record.

Jani's remaining claims of procedural impropriety -- assuming without deciding that they were

administratively exhausted -- fare no better. First, Jani argues that the IJ improperly held an evidentiary hearing in 2008 that led it to reverse its prior grant of asylum to Jani, when it should have limited the hearing to reconstructing the record. However, the BIA instructed the IJ to "take such steps as are necessary and appropriate to enable [the] preparation of a complete transcript of the proceedings including a new hearing, if necessary." (Emphasis added.) That is precisely what the IJ did. Nothing in the BIA's order precluded the IJ from hearing additional testimony, or conducting further fact-finding, as part of its need to reconstruct the record. Second, Jani claims that the IJ failed to conduct a "de novo" hearing as instructed by the BIA after its second remand order in 2011. The INA does not define "de novo," but Jani argues that the hearing should have been conducted from scratch, i.e., "as if the original hearing[s] had not taken place." To Jani, the BIA's "de novo" instruction precluded any further reliance -- either by DHS or the agency -- on the previous record, including the 2006 hearing transcript. But conducting a hearing de novo does not require turning a blind eye to testimony from a prior hearing. Or at least Jani cites no authority for so construing the BIA's order for a de novo hearing.

In short, Jani had ample opportunity to "examine and object to the evidence against him" and "to present evidence in

his [] own behalf" across at least three hearings before the IJ. Id. § 1240.10(a)(4). He has suffered no lack of due process.

## B.

We next turn to Jani's claim that the agency failed to effectively terminate his derivative asylee status, which Jani says has been administratively final since at least 2006.

## 1.

Under the INA, "[a] spouse or child . . . of [a noncitizen] who is granted asylum . . . may, if not otherwise eligible for asylum, . . . be granted the same status as the [noncitizen] if accompanying, or following to join, such [noncitizen]," 8 U.S.C. § 1158(b)(3)(A), "unless it is determined that the spouse or child is ineligible for asylum" under the law, 8 C.F.R. § 208.21(a). Otherwise, derivative asylees "shall be granted asylum for an indefinite period unless the principal's status is revoked." 8 C.F.R. § 208.21(g).

As to finality, "[e]xcept when certified to the [BIA], the decision of the [IJ] becomes final upon waiver of appeal or upon expiration of the time to appeal if no appeal is taken[,] whichever occurs first." Id. § 1003.39. If an appeal is taken, the IJ's decision remains non-final, and jurisdiction vests with the BIA, whose decision then becomes final unless it remands the case back to the IJ or refers it to the Attorney General. See id. § 1003.1(d)(7). An IJ or the BIA may also "reopen" a final

decision for purposes of terminating a grant of asylum. Id. § 208.24(f). "In such a reopened proceeding, [the government] must establish, by a preponderance of evidence, one or more of the grounds" of asylum ineligibility. Id.

**2.**

Jani argues that because Sumago's claim and his derivative claim were consolidated and granted in 2006, DHS's waiver of its right to appeal Sumago's principal claim rendered both their claims final. Consequently, he argues that the agency erred in treating his claim as non-final in subsequent proceedings, and that it failed to hold DHS to its burden under 8 C.F.R. § 208.24 to show that Jani's derivative asylee status should be terminated.

Jani's argument is belied by both the record and regulation. First, the IJ's order granting Jani derivative asylee status on August 15, 2006, expressly noted that DHS reserved its right to appeal his claim, which DHS had also reserved at the conclusion of the hearing itself. DHS then promptly appealed Jani's claim to the BIA on September 12, 2006. The BIA, in turn, remanded proceedings to the IJ, who then found Jani ineligible for asylum. At no point did Jani receive a final administrative order granting him asylum. The agency, therefore, properly treated Jani's claim as non-final in subsequent proceedings. See 8 C.F.R. §§ 1003.1(d)(7), 1003.23 (noting that an IJ's order is not final if properly appealed to the BIA).

Meanwhile, Jani points to no authority requiring that DHS appeal the IJ's grant of asylum to Sumago in order to appeal Jani's derivative claim. The INA specifically contemplates circumstances such as this, where a principal applicant may be eligible for asylum but their derivative claimant is not. See 8 U.S.C. § 1158(b)(3)(A) (stating that a spouse of an asylee "may" be granted asylum "if not otherwise ineligible for asylum"). As a result, we find no error in the agency's treatment of Jani's derivative claim as non-final, despite the finality of Sumago's principal claim.

## IV.

For the foregoing reasons, we must deny the petition.